NEVILLE v. POSTAL TELEGRAPH
CABLE CO.

—

(March 10, 1930. Opinion and Decree.)

—

William C. Fitts, of Birmingham, Ala., and Denegre, Leovy & Chaffe, of New Orleans, attorneys for defendant, appellant.

Edward A. Parsons, of New Orleans, attorney for plaintiff, appellee.

WESTERFIELD, J. Mrs. Myra J. Neville brings this suit against the Postal Telegraph Cable Company, for damages for personal injuries which she suffered by reason of an accident which occurred at the intersection of St. Charles avenue and Valence street in the city of New Orleans, on Sunday, March 20, 1927, at about 12:30 p. m.

The case was tried by a jury and a verdict rendered in favor of plaintiff for the sum of $18,949.20, the full amount prayed for. Defendant has appealed.

Mrs. Neville, at the time of the accident, had reached the advanced age of seventy-three years, though she insists, that prior to that unfortunate occurrence, she still retained youthful vigor, sound health, and agility. At the time of the accident, she was crossing St. Charles avenue at the intersection of Valence street, having entered the street from the river curb with the intention of crossing to the neutral ground. Just before reaching her objective, when at a point three feet distant from the neutral ground, she was struck by a motorcycle driven by a young man named Yuratich, an employee of the defendant telegraph company, and seriously injured. She gives the following statement of the occurrence:

"When I reached Valence I walked to St. Charles Avenue, and when I got to St. Charles and Valence there were several cars passing, and I let those pass. Then I looked up the street, and there were several more coming, and I let those pass. I looked again up St. Charles, and there was only one car coming, and that was about at least three-quarters of a block away, perhaps more. I crossed the street to go to the neutral ground, and when I was about three feet, I suppose, from the neutral ground, something struck me. I lost consciousness right then, and the next thing I remember, I was being carried to a car—an automobile —and they took me to Touro Infirmary."

The driver of the motorcycle is alleged to have been negligent in that he was operating his vehicle at an excessive rate of speed. One of the witnesses, a Mr. Wigley, who was driving an automobile in the vicinity of the accident, testified that the motorcycle passed him when in the middle of the block between Bordeaux and Valence, a point about one hundred and fifty feet distant from the corner of St. Charles and Valence, where the accident occurred. He stated that the motorcycle was running about fifteen miles per hour faster than he was, and he gives his speed as twenty-five miles per hour, which would make the speed of the motorcycle forty miles per hour. He also testified that after passing him there was a clear view of the corner unobstructed by any other vehicle or, in other words, that for more than one hundred feet Mrs. Neville was in plain view of Yuratich, the driver of the motorcycle.

Opposed to this evidence is the testimony of a Mrs. R. W. Conner, that of Yuratich, and of a party by the name of Plunkett, who was riding on the motorcycle with Yuratich, it being a two-passenger machine. These witnesses substantially agree in their statements to the effect that for more than a block before reaching the intersection of St. Charles avenue and Valence street, the motorcycle was being driven at the rate of not more than twenty-five miles per hour behind a Ford coupe owned and operated by Mrs. Conner, and that as they reached the corner of Valence street and, when at a point about 15 feet distant from Mrs. Neville, Mrs. Conner suddenly swerved to the right towards the river curb, and for the first time exposed Mrs. Neville to the view of the driver of the motorcycle.

Yuratich testified that at the time that Mrs. Conner moved over to the right, he had swerved his machine to the left with the intention of passing her on that side and that, therefore, he could not follow Mrs. Conner's course to the right and could not run off of the street to the left because of the presence, immediately in front of him, of an oak tree on the neutral ground, and, that in that situation, he did that which he conceived to be the most advisable under the circumstances, which was to endeavor to squeeze in between Mrs. Neville and the neutral ground.

The four witnesses, whose testimony we have discussed, are the only eye witnesses, and the conflicting character of their statements is evident. Mr. Wigley and Mrs. Conner are both disinterested witnesses and both according to the record very reputable persons, but their statements cannot be reconciled. There is, however, a clear preponderance of the evidence favoring Mrs. Conner's version of the accident and, under familiar principles of civil procedure, it must be accepted.

Yuratich gives the distance between his motorcycle and Mrs. Conner's automobile as between ten and fifteen feet. This distance, he says, was maintained for more than a city block before the accident. His view was entirely obstructed by Mrs. Conner's car. He gives no explanation as to why he should place himself in this position where, for a long distance, he was unable to observe traffic conditions ahead of him and to provide for the probable event which caused the accident, in this case, the sudden turning of Mrs. Conner to the right resulting in the equally sudden removal of this obstruction of his vision under circumstances which would not permit of his avoiding a collision with vehicles and/or pedestrians. We are by no means certain that in following Mrs. Conner so closely at the speed of twenty-five miles per hour in a cul de sac, such as Yuratich placed himself, was not in itself negligent. See section 17(a), Act No. 296 of 1928, also Youman et al. vs. McConnell & McConnell, Inc., 7 La. App. 315.

Assuming that Yuratich was negligent, the next question to be considered is whether Mrs. Neville was guilty of contributory negligence, for defendant has made this point. Mrs. Neville testified that just before leaving the curb of the sidewalk on St. Charles avenue, she permitted several automobiles to pass her, and that looking in the direction of traffic, she saw an automobile about three-fourths of a block away, entered the street, and started to cross; that after having left the curb, she did not again look in the direction of traffic. Mrs. Conner, who was undoubtedly the driver of the automobile which Mrs. Neville observed, testified that she was driving a Ford coupe down St. Charles avenue at a rate of twenty-five miles per hour; that as she approached Valence street she saw an old lady, who proved to be Mrs. Neville, cross into the street without looking either to the right or left "so I realized that I must get over that way as quick as I could, towards the houses on the avenue."

It is evident to our minds that Mrs. Neville misjudged the distance of Mrs. Conner's car, as well as the speed at which it was traveling. See Smith vs. Interurban Transfer Co., 5 La. App. 704, where it was said in reference to a similar act by the plaintiff in that case:

"If she did in fact look and see the bus coming and overestimated the distance, that was her misfortune and not the fault of the driver of the bus. If she did see the bus, she was unquestionably mistaken as to its distance from her; for if it had been as far from her as she says it was it would not have reached her before she crossed the road."

But, her conduct in walking across the street after having seen an approaching car, without having again looked in the direction of the car, presents the serious question involving her negligence. Her counsel insists that as a pedestrian she had an equal right to use of the street; that she had a right to cross where she did, and, that in looking straight ahead

of her, she was doing that which a prudent person should do, and that she was under no obligation to look again towards the approaching car, or, as he puts it, to walk in one direction, with her head and eyes pointed in another. He concludes that "if Mrs. Neville was negligent in crossing the street in the manner in which she did, then it is practicaly impossible for any pedestrian in this motor age to cross any thoroughfare in any modern city in the Western World."

It cannot be denied that the way of the pedestrian is hard, and growing harder every day, his correlative right to the use of public streets is exercised with increasing peril, a fact which we have heretofore recognized. As we said on that occasion, "We would not wittingly contribute to the further embarrassment of the pedestrian for he has, indeed, fallen upon evil days. Shorn of all prerogatives, he follows his ancient and honorable course through the streets of our great cities, tolerated but not respected, his every step fraught with imminent danger of death and disaster by external violent and accidental means. His precarious breath impregnated with noxious gases calculated to inflame his mucous membrane, he trods his weary, asphyxiated way, escaping, as best he may, the steam and electric juggernauts of the rail, with a sporting chance, as long as the hot blood of youth courses through his veins, of avoiding the more threatening firebreathing gasoline monster. But, when love's young dream is over, when the agile step of youth begins to falter, he cannot reasonably hope to avoid violent, if not fatal contact with that greatest of all modern facilities, most dangerous and death-dealing instrument, the automobile." Gonzales vs. Allen, 7 La. App. 551.

But a pedestrian must be expected to act with ordinary care and prudence, and, when stepping into a street and seeing an automobile, it is not sufficient to thereafter ignore its presence and depend upon the accuracy of one's judgment in estimating its speed and distance, without assuming the risk involved. Mrs. Neville is at pains to insist that she was possessed of great vigor and vitality, and her counsel quick to impress this fact upon our attention. We cannot but regard her failure to take a second look at the automobile as negligent and imprudent, to say the least. If she was as vigorous as she claims to have been, her agility might have served to avoid the accident. If her physical condition has been exaggerated, and she was suffering from the usual infirmities of age, there was all the more reason for vigilance, after having committed herself to a dangerous crossing. It might have been different if her first look had failed to reveal the presence of any vehicle within her vision.

"After looking at the curb for approaching vehicles before crossing the street to take a street car, and seeing none, or believing it safe to cross, a prospective passenger is not required as a matter of law to look again in the course of such crossing." Blashfield's, vol. 1, p. 688, citing Phillips vs. Taxi Service Co. (C. C. Mass.) 183 F. 869; Sommer vs. Martin, 55 Cal. App. 603, 204 P. 33; Lewis vs. Seattle Taxicab Co., 72 Wash. 320, 130 P. 341. But to have observed the oncoming vehicle and to have failed to look a second time was most imprudent.

In Roder vs. Legendre, 147 La. 295, 84 So. 787, 789, where the plaintiff on a rainy night, with an umbrella in her hand, attempting to cross Canal street after having seen automobiles a block and a half or two blocks away, and without having looked again when she was ready to cross

the street was struck after having stepped into the roadway, the court said:

"The relative rights of pedestrians and drivers of automobiles have been frequently formulated and are frequently applied, and they have crystallized into the statement that their rights are equal and reciprocal, and that each must use such caution and prudence as the situation demands. And, having seen the automobile approaching at a distance, it was the duty of plaintiff to look again as she left the sidewalk, as prudence and caution would have dictated to have been done by the ordinary person. The fact that plaintiff did not look and avoid the accident was the proximate cause of the accident to her."

In Berry on Automobiles (6th Ed.), vol. 1, p. 361, we read:

"Where a pedestrian, before going into a street at a crossing, saw and heard an automobile approaching about 130 feet distant, and then continued in the street without again looking for the machine, and was struck by it at a point about 35 feet from where he was when he saw it, it was held that he was contributorily negligent and could not recover"—citing McCormick vs. Hesser, 77 N. J. Law, 173, 71 A. 55. See, also, Laughlin vs. Seattle Taxicab & T. R. Co., 84 Wash. 342, 144 P. 847; Myers vs. Cassity, 209 Ky. 315, 272 S.W. 718.

We find the following text in Blashfield's Cyc. Auto. Law, vol. 2, pp. 1042, 1043:

"As a pedestrian cannot be charged with negligence as a matter of law because he does not look for approaching vehicles while crossing the street, so it is also true that a pedestrian does not as a matter of law discharge his obligation to exercise ordinary care in crossing the street by merely looking before stepping off"—citing Livingstone vs. Dole, 184 Iowa 1340, 167 N.W. 639; Rolfs vs. Mullins, 179 Iowa 1223, 162 N.W. 783.
"However, in crossing between intersections, the exercise of ordinary care by a pedestrian is not fully performed by merely looking to the left or right as he steps upon the street, but the observance of that degree of care is imperative upon him during all the time that he is crossing." See Sheldon vs. James, 175 Cal. 474, 166 P. 8, 2 A.L.R. 1493.

But, it is said, that the doctrine of last clear chance applies. We doubt its application, for as was said in Harrison vs. Louisiana Western Railroad Co., 132 La. 761, 61 So. 782, 784:

" 'This so-called exception to the rule of contributory negligence (i. e., the doctrine of "last clear chance") will not be extended to cases where the plaintiff's own negligence extended up to and actually contributed to the injury. To warrant its application there must have been some new breach of duty on the part of the defendant subsequent to the plaintiff's negligence.' A. & E. E. of L. Suppl. vol. 2, p. 64, notes 4 and 5."

But, in any event, the driver of the motorcycle had no opportunity to prevent the unfortunate accident after he discovered the danger of Mrs. Neville's position. The same situation is presented here as was considered by the court in Roder vs. Legendre, supra, where in discussing a similar case the court said:

"Plaintiff argues that she should recover damages under the doctrine of the last clear chance. But there is no place for the application of that doctrine here. There is no evidence whatever going to show defendant was guilty of a willful act of negligence, or that he was wanton in his disregard of the life and safety of plaintiff. And there is no evidence going to show that defendant had it in his power, or should have had it in his power, to have prevented the accident to Mrs. Germann, after he discovered the danger of her position."

It follows from what has been said, that the judgment appealed from must be reversed.

For the reasons assigned, it is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, annulled, avoided, and reversed, and it is now ordered that there be judgment in favor of the defendant, Postal Telegraph Cable Company of Louisiana, Inc., and against the plaintiff, Mrs. Myra J. Neville, dismissing her suit at plaintiff's cost.