**In re Kenneth Joseph DOWNS, an Attorney.**

No. 48820.

Supreme Court of Missouri,

En Banc.

Jan. 14, 1963.

Walter M. Clark, Charles C. Allen, Jr., George S. Hecker, St. Louis, special counsel for informants.

Francis M. O'Brien, St. Louis, for respondent.

EAGER, Judge.

An information was filed in this court, by leave, charging Respondent Kenneth Joseph Downs with professional misconduct; the information contains 19 counts. It was filed by the Bar Committee of the Twenty-Second Judicial Circuit after the Committee had first heard evidence informally and later, upon notice and formal hearings, had found probable cause to believe that Respondent was guilty of the misconduct now charged. The Respondent has filed answer admitting various formal matters but denying all misconduct. We appointed the Honorable James Austin Walden, of the Randolph County Bar, as our Special Commissioner; he held hearings in the City of St. Louis for four days and has filed a most complete and thorough report of his findings of fact and conclusions of law. The transcript of the evidence is in excess of 800 pages. Respondent was found guilty of professional misconduct on 12 of the 19 counts and his disbarment has been recommended. Respondent has been represented by counsel both before the Bar Committee and the Commissioner. It will be impossible here to avoid a rather detailed statement of much of the evidence.

Respondent, a graduate of the Law School of St. Louis University, was admitted to the Bar in 1954. During most of 1956, all of 1957 and most of 1958, he occupied a suite of offices in St. Louis with one Milton Fox, another lawyer. At various times there were also others in these offices. Respondent and Fox were not partners; Respondent made certain investigations for Fox at an hourly rate of pay, tried cases for him upon a division of fees, and handled entirely certain miscellaneous matters which came to Fox, such as criminal cases and divorce suits. Respondent also had his own business, which consisted essentially, if not entirely, of personal injury cases. He filed many personal injury suits for clients of Fox, but in so doing he used only his own name on the petitions. He said that this was done at Fox's direction, and the latter confirmed this in his testimony. Respondent and Fox regularly used a printed form of contingent fee contract 3½ by 8½ inches, a little larger than the ordinary check. Since there will be much reference to such contracts, we quote the form as follows: "I hereby employ ———— as my attorney—— to represent me in my claim against ———— founded upon ———— sustained by ———— on the —— day of ———— 19——, by ————————— For services I agree to pay you ———— per cent. of the amount collected either by compromise or by suit.

Accepted ————————————

———————————— ————————————,"

Attorney—— at Law

In all the contracts involved here the fee was one-third, and only the prospective client signed. In substantially all of these matters Respondent had the claimant write on the back of the contract a statement: "Referred by ———— at my request," filling in a name. He said that this was done where the client was Fox's, and at the direction of the latter; that he did it only occasionally on his own business but, with one exception, every contract introduced in evidence here contained such an endorsement. Fox testified that this was done for his protection against charges of solicitation, and in view of a "witch hunt" which had been prosecuted in St. Louis some 7–8 years previously. One witness testified that Respondent told him that the reason was to enable him to compensate the person referring the case to him.

Five witnesses, three of whom were lawyers, testified that Respondent's reputation for "truth, honesty and integrity" was good, or very good, or excellent. Such evidence is of no great materiality in a matter of this kind. The first four counts involve

Respondent's relations with James B. Herd, then a law student at St. Louis University, and a practicing lawyer since September 1959. Herd testified that about June of 1957 he was told by an instructor that Respondent wanted someone to work for him as a part-time investigator, that he applied for the job, told Respondent that he was a law student, and was employed. He further testified: that Respondent agreed to pay him $2.50 an hour for investigative work, but further agreed to pay him $25 for any "garden variety" lawsuit that he found and brought in and more for those which were "attractive"; that Respondent gave him a supply of his business cards, and of the contingent fee contract forms; that his investigative work was irregular, that he worked only when Respondent called him, that he kept his own time and was paid at two-week intervals; he never brought in a lawsuit which he himself discovered; he quit after about six weeks because the Dean of his law school told him (and this was brought out by Respondent's counsel on cross-examination) that he had learned that Mr. Downs "had made certain untoward propositions" to recent graduates and that "he suggested that I terminate." Herd also testified: that he was sent by Respondent at various times to interview specific persons, take statements, and try to get contracts signed; that he did get some contracts; that he did not know those people and was merely given the name and address in each instance, being told what to do; that in certain instances the people "would indicate to me by their conduct that they had never heard or known of Mr. Downs"; that when the person supposedly referring the matter was mentioned, some said they knew the person but "on a number of occasions it was source of embarrassment, I wasn't expected, and when the name of Mr. Downs came up and who I was or what I was there for, there was a blank reaction or no reaction by these people"; that all such calls were made at the direction of Downs or his secretary; that on one occasion he was so sent to a hospital to see a colored woman who had had her leg severed,

with instructions to get her statement, and determine if she was "interested in having Mr. Downs represent her," and that if she was unrepresented and desired counsel, to do everything possible to get a contract signed; that at the same time Downs told him that he represented a trucking concern or owner which was involved; that he found at the hospital that the woman was in no condition to talk; that one of the persons around her told him that the woman already had a lawyer and that there was no truck involved; that he later called the woman's lawyer who became very much irritated and wanted to know Herd's name and whom he was working for; that Downs later admitted that "there was no truck involved," and that he did not represent any one involved. He further testified: that on one occasion he was directed by Downs to go and interview a certain person in East St. Louis who was a new client whom Downs had not seen, to get the case signed up, put the people at ease, and because he (Downs) had made an appointment to go himself, to "tell the people that I was Mr. Downs"; that he went, that the prospective client was expecting Mr. Downs, that he did nothing to dispel the illusion, and that the ultimate result (cross-examination) was that the person "felt that he had been contacted by Mr. Downs," which was the "impression" he, Herd, was trying to give.

Respondent admitted the employment of Herd for investigative work and the payment to him of sums of $75.90 and $19.40. He testified that this work was actually that of his associate Fox which he was farming out; Respondent specifically denied that he sought, through Herd, to influence people to give him personal injury claims, and asserted that the cases where Herd got contracts were Fox's cases; Respondent denied that he ever told or authorized Herd to represent himself as Downs.

The Commissioner found that Counts 1, 2 and 4 were sustained by the evidence and that Count 3 was not; he also concluded that Downs' actions, as thus proven, were

violations of the Canon of Ethics as exemplified in Rules 4.28, 4.34 and 4.47 (Count 1), Rules 4.27, 4.28 and 4.47 (Count 2) and 4.22 and 4.47 (Count 4), V.A.M.R. Count 1 charged that Respondent agreed to pay Herd, a layman, for personal injury claims of others which he referred to Respondent. Count 2 charged that he caused Herd, a layman, to seek to influence the bringing of personal injury claimants to Respondent and to procure contracts from them, although such persons had not sought his services. Count 3 charged that he caused Herd to bring such persons to him for employment. Count 4 charged that Respondent authorized and instructed Herd to represent himself falsely and fraudulently as the Respondent to a prospective client. We concur with the findings of our Commissioner, who heard all the evidence, viewed the witnesses and passed upon their credibility; we also find, and from our independent review of the evidence (all of which we have read) that the charges of Counts 1, 2 an 4 have been established. Since Herd was not shown to have actually procured any contracts "on his own," the allegations of Count 3 were not established.

Counts 5 and 6 charged that in the summer of 1957 Respondent made proposals to one David S. Hemenway (Count 5) and Gerald D. Morris (Count 6), both recent law graduates who had taken the Bar Examination but were not yet licensed, that they should get jobs as adjusters with a casualty insurance company and refer to him personal injury claimants against the company's insureds (Hemenway and Morris). and solicit the employment of Respondent by insureds of the company where such persons themselves had claims for personal injuries against others (Hemenway); that in return Respondent offered office space and secretarial service to both, the sharing in contingent fees of any insureds who were so referred (Hemenway), and agreed to allow Morris to retain all fees on his own cases when admitted to the Bar. These two men, both practicing lawyers at the time of the hearing, fully substantiated these charges; Hemenway was, at that time, an Associate City Counselor in St. Louis; Morris was a trial attorney for the Transit Casualty Company. Both men had seen notices or had heard orally at law school that Respondent wanted to talk to young men concerning possible employment. Hemenway testified also that Respondent suggested that they could thus go together to an insured's home and represent themselves as coming from the insurance company. Neither witness accepted any such proposition. Respondent, essentially, denied the making of any and all such propositions, and stated with reference to Hemenway, that he had no employment to offer. That statement was wholly inconsistent with another statement he made twice later to the effect that he was always looking for people to do investigative work. The Commissioner found that Respondent had made such proposals to both of these men. We so find from our review of the evidence, and find also that such conduct was a clear violation of Rules 4.27 and 4.28.

In Count 7 Respondent was charged with telling certain law students who were applicants for admission to the Bar, and who had come to him seeking possible employment (James B. Herd, David S. Hemenway and Gerald D. Morris) that practicing lawyers disregard the Code of Ethics, that the practice of law is a business,—that solicitation and division of fees with laymen are proper and accepted practices of lawyers in the St. Louis area and constitute the only way that lawyers get business, and that they should disregard the Code of Ethics. Respondent denied making such statements, saying that these men had formed erroneous conclusions from his remarks. Herd testified: that Respondent said that he had made a lot of money though a young man, and that he made it the way "everyone else downtown" was making it; that certain lawyers abused the Code and "received for this abuse only a slap on the wrist from the courts" and were never disbarred; that one lawyer was suspended for a year, went to Europe, came back and could now afford

to be respectable since he had made his money, and that this was the way he intended to operate. Hemenway testified that he raised the question of ethics with Respondent when the latter suggested that he get a job as an adjuster and refer cases to him; that Respondent's answer was: " * * that this was part of the law business, doing business, you had to. If you are in business you had to make money and the ethics were of no consideration, and you had to make money one way or the other. He pointed out to me I had no connections, as I just told him in the interview. He pointed out to me that I had no connections with any law firm and that you have to get business some way. * * * everyone does it or everybody does it, or something to that effect. * * * Procures business in such a manner that you have to procure business any way you can get it, that if it is unethical, everybody does it." Morris testified that: "Mr. Downs indicated that I should disregard ethics, the ethics that I learned in law school and the ethics of the profession. * * * Well, as I recall, he said, 'All lawyers were jealous of each other.' I don't recall anything else being said about it, except that I should disregard it, the law was a business and there was no place for ethics in it." These three men were *law students,* known to Respondent as such, and two of them were then applicants for admission to the Bar. Their credibility was not actually attacked and we find their testimony to be true, as did the Commissioner. Its effect is devastating, and this is perhaps the most serious of all the 19 charges. We find also that Respondent was therein guilty of the most reprehensible conduct, in violation of Rules 4.29, 4.32 and 4.47.

Count 8 charged that Respondent proposed to William S. Hoffman, a lay adjuster, that he, Hoffman, "seek out persons with claims for personal injuries and secure them as his, Respondent's, clients." At the time of the hearing Hoffman was an adjuster for the Western Casualty Company; in the fall or early winter of 1958 he was attending law school and adjusting claims out of the law offices of Harlan and Harlan in St. Louis County. The conversation in question occurred in the fall or early winter of 1958, when Hoffman was talking to Respondent by phone concerning a personal injury claim in which both were interested. Respondent then offered Hoffman employment at an hourly rate of $3.50; as to the nature of the employment, Hoffman testified: "He stated that I would be out on the streets getting cases for him. Q Getting cases for him? A Yes, personal injury claims. Q Did you discuss or did he discuss any other duties that you would have? A No, he didn't. Q What did you reply to this, if anything? A I more or less tried to find out what the job would involve. He was fairly vague about it, stated that mostly—to the effect—the most I could get out of it was that I would be trying to get cases to refer to him." Hoffman did not accept the employment. Respondent admitted talking to Hoffman about doing investigative work, but denied making the other proposals. The Commissioner found that the offer was made as so testified to by Hoffman, and that Respondent's conduct was in violation of Rules 4.27, 4.28 and 4.47. We concur in this.

We next consider Counts 9, 15, and 16, jointly. They all arise out of an incident in which a stationary taxicab was supposedly struck in the rear by a car driven by a Mrs. Pelham Robinson on March 17, 1956. One Ezell Ray was the driver of the taxi, and Harry Ball and Margaret Thompson, a negro woman, were passengers. In Count 9 Respondent was charged with the solicitation and procuring of a contingent fee contract from Margaret Thompson; in Count 15 he was charged with representing and filing suit for Harry Ball without authority, also with failing to account to Ball; in Count 16 he was charged with representing to Mr. and Mrs. Robinson that he "represented" (i. e., was attorney for) Ezell Ray when such was not, in fact, true. The Commissioner has found that Counts 15 and 16 were not sufficiently proven. As to 15, this was largely due to the almost

total confusion in Ball's testimony; as to 16, Ezell Ray identified his signature and endorsement on the contingent fee contract, though claiming a lack of memory of the circumstances. We agree with the Commissioner that Counts 15 and 16 were not established. We shall not, therefore, add any facts to this necessarily long opinion dealing specifically with those counts. Margaret Thompson (Count 9) testified: that Respondent appeared at her home (near which the accident occurred) on the day of the accident, and before she had gone to her family physician, Dr. Vaughn Payne; that he rang the bell and said that he was a lawyer; that she did not know him and had not sent for him; that he came in, talked about the case, asked who her doctor was, had her sign a contract and had her also write on the back a statement that she had been referred by Dr. Payne; that later on the same day she went to Dr. Payne; that some time after the accident she took Respondent's card to Dr. Payne and asked if he knew Respondent; that Dr. Payne said that he did not, except that he knew that he was in the office with Milton Fox. It was developed that in this witness' prior testimony before the Bar Committee in June 1960, she had testified in part that she believed Downs came to her house after she had been to the doctor and, in substance, that it had all been so long ago that she had forgotten whether Dr. Payne referred Downs to her; she did testify, then, however, that Downs was "right in there so quick." On further cross-examination at the present hearing she was very definite that Respondent came to her house on the day of the accident and *before* she had been to the doctor; also, that later on the same day she did go to Dr. Payne, and that the doctor did not refer her to a lawyer. She explained these discrepancies with the statement that she had since reviewed the matter with her husband, who was at home on the day of the accident, and that her memory was thus refreshed to the extent that she could herself remember the sequence of events. Respondent testified that Mrs.

Thompson called him about a month after the accident, that when she called she said she had been referred by Dr. Payne, and that he took a contract. Neither the contract nor a subsequent statement from her were offered in evidence by Respondent. In this case Respondent did not contend that he had been sent out by Fox, but nevertheless he took the usual referral statement on the back of the contract. This woman got nothing on her claim. Dr. Payne, a negro physician, testified that Mrs. Thompson first came to his office on March 17, 1956; he had testified at the prior hearing that she came first on March 19; this is not particularly material, since the patient also testified that she had gone to him on the 17th. He further testified that "later on in the case" Mrs. Thompson did ask him about Mr. Downs, saying that some of her friends had recommended him, and that he then did recommend Downs. At a prior hearing he had testified that: "I didn't tell her to get anybody." From his total testimony it appears that the mention of Downs came after Mrs. Thompson had been unable to get any results by way of settlement, and certainly not for some days after the accident. While, in some of its phases, the testimony of Mrs. Thompson was self-contradictory, this is an excellent illustration of the need for and value of an able commissioner who hears the evidence and determines questions of credibility. The Commissioner here has found that Downs solicited Margaret Thompson, without any request, and that he thus persuaded her to execute the contingent fee contract. We find nothing in the record to indicate that we should reject his views on credibility; we further find Respondent guilty of unprofessional conduct on this charge in violation of Rules 4.27, 4.28 and 4.47.

Counts 10, 11 and 12 involve a collision or series of collisions occurring in St. Louis County on May 27, 1958, in which Owen Kelly, Harold Hartwig and one Lyles were involved; this was a sort of chain reaction affair resulting when another car, headed in the opposite direction, was

struck by a pickup truck, and pushed in front of Kelly's moving car. These men were working at McDonnell Aircraft, and were riding in a car pool. Hartwig was a registered engineer. In Count 10, Respondent was charged with representing conflicting interests in that he took a contract from Hartwig, failing to advise him of his cause of action against his own driver Kelly, whom Respondent also represented. In Count 11, Respondent was charged with advising Hartwig that it was impossible for him, Hartwig, to discharge Respondent, with falsely representing to Hartwig that he had already filed suit on his behalf, with encroaching upon Hartwig's employment of other counsel, and with communicating directly with Hartwig and discussing the facts after the latter had employed other counsel. In Count 12, Respondent was charged with falsely representing to Hartwig's subsequent counsel that he had instituted suit when he had not in fact done so, and with actually filing suit knowing that he had been discharged as Hartwig's counsel.

The facts and circumstances of this collision, brought out in some detail before the Commissioner, seemed to indicate no real probability of establishing Kelly's negligence. The Commissioner found that Hartwig had stated to Respondent that Kelly was in no sense at fault, that Respondent was justified in believing that there would be no conflict and that there was no violation of the rules in connection with Count 10. We so find here and it is therefore unnecessary to state further facts concerning Count 10. At this point we must pick up additional facts, however, on Counts 11 and 12. Respondent had been recommended to these people by one Mooney, a brother-in-law of Kelly, who had worked for Respondent; Hartwig had signed, at Mooney's suggestion, a contingent fee contract employing Respondent. Shortly thereafter Respondent had a conference with the three directly involved and Mooney, at Kelly's house. A little later, Hartwig, after talking to a lawyer of his own acquaintance, decided that it would be better if he employed other

counsel than the one Kelly had, and that he should discharge Respondent. He employed the firm of Cook, Murphy, Lance and English, and wrote Respondent on June 12, 1958, as follows (omitting the paragraphing): "I would like to notify you at this time that I feel it to my best interests to hire another lawyer to represent me in connection with the automobile accident on Lindbergh some time ago. I will be happy to defray all costs incurred by you up to this time in my behalf, and trust that I will not have inconvenienced you. Please accept this letter as notice to yourself that you will no longer be representing me. I wish to thank you for all your efforts in my behalf to this point, and hope to remain. Sincerely yours, HHH Harald H. Hartwig." By letter of June 13, Downs replied that Hartwig was "confused," that he had already made an appointment for him for a medical examination, that he had prepared and filed suit, and that Hartwig should make an appointment, come to Downs' office and he, Downs, would explain that "What you asked * * * is impossible." Within a few days after June 13, Respondent or Mooney called Hartwig and both of them talked to Hartwig on a joint telephone "hookup"; Hartwig testified that this was a long conversation, that Respondent stated that once he had engaged an attorney he could not discharge him, that he, Hartwig, was merely employing additional counsel, that each would receive one-third of the settlement, that he discussed the facts of the accident, and that he wanted to know if Hartwig was going to change his testimony, to which Hartwig replied that Respondent should see his attorney, Mr. Lance. Hartwig further testified that Respondent said that he should "cancel out Mr. Lance," whom he told Respondent he had employed. Milford T. English, a partner of Mr. Lance, testified: that right after his firm was employed, and between June 12 and June 15, he called Respondent on the phone, and that Respondent stated that he intended to keep on representing Hartwig and that he had filed suit. English checked the records and

found no such suit; he subsequently had another phone conversation with Respondent, in which he told Respondent that he found no record of any such suit and asked for the number; Respondent left the phone a short time, but came back and replied that he did not have the number, but repeated "I have filed the lawsuit." On the next day English checked again and found no suit, checking also the reverse index on defendants. On June 14, Mr. English filed suit for Hartwig, as shown by the court files; in that suit Kelly, the driver, was joined as a defendant, along with the driver of the truck. Thereafter Respondent did file suit on June 18; in a letter of June 16 to Mr. English's firm Respondent again stated that he had filed suit, that he had a written contract and a lien, and that he *represented* Hartwig. Both suits were filed in St. Louis County. On June 17, Mr. English advised Respondent of the filing of suit, and requested a statement of his services and expenses. Apparently no response was received. Later Mr. English filed a motion to dismiss the suit filed by Respondent, gave notice, and the court dismissed the suit. The Commissioner has found as to Count 12 (the false representation of filing suit) that while the statements were untrue, Respondent was conceivably misled by his stenographer's statement to him, after he had dictated the petition and supposedly told her to mail it to the clerk, that "that's all taken care of." This was a part of Respondent's testimony. Hence, the Commissioner found that it was not established that Respondent knew, at the time of making these statements to English, that they were untrue. We accept this finding, but with some misgivings. Respondent identified his signature on the petition but did not know when he signed it; he could not have signed it before it was transcribed; he could not find the check, so he said, which was mailed for the filing fee, which either he or his wife would have signed, and which, of course, would have borne a date; and he testified that he had "dictated these three long petitions" to his stenographer (Hart-

wig's, Kelly's and Lyles') when in fact Hartwig's petition contained 24 lines. The Commissioner heard the explanations. We did not. We find Respondent not guilty of unprofessional conduct on Count 12.

On Count 11 (the encroachment upon Hartwig's employment of another lawyer and his refusal to stand discharged) Respondent's testimony was rather confusing. Essentially, he maintained that he did not and was not required to agree to the termination of a "bi-lateral" contract, that Hartwig's letter was ridiculous, and that you can't "hire and fire" a lawyer in such manner; he also testified that he told Hartwig that while he could hire other counsel, he would have to "split the fee," and that if his contract was broken he would be entitled to a suit for "damages." We cannot repeat here all of that testimony. The Commissioner found that Respondent had thus directly encroached upon Hartwig's employment of other counsel and that, after knowing of such employment, he communicated directly with Hartwig. The Commissioner has further found this to be a violation of Rules 4.07, 4.09, 4.11, 4.22 and 4.47.

 There can be no doubt of the right of a client to discharge his lawyer, whether he be employed on a quantum meruit basis or for a contingent fee. In such event, if the lawyer has a contingent contract and is without fault, he has the election to claim a reasonable fee for the work done, as upon a mutual rescission, or to wait until the claim is liquidated by judgment or settlement and then sue (if necessary) for his contract fee. Mills v. Metropolitan St. R. Co., 282 Mo. 118, 221 S.W. 1; Barthels v. Garrels, 206 Mo.App. 199, 227 S.W. 910; In re Thomasson's Estate, 346 Mo. 911, 144 S.W.2d 79; 7 C.J.S. Attorney and Client § 109, pp. 940–941. While here there was some discussion by Respondent to the effect that he would still be entitled to a fee, we conclude from all the testimony that he insisted that Hartwig could not discharge him, suggested that he, Hartwig, "cancel out" the other attorney, and that he thus

interfered with his client's rights and encroached upon the subsequent employment; nor did he have the right to telephone Hartwig after the discharge, communicate directly with him, argue with him about the discharge, and discuss the merits of the case. We hold Respondent thus in violation of Rules 4.07, 4.09 and 4.47.

On Counts 13 (a charge of misrepresentation to one Dee Mobely of the amount to be received upon a settlement) and 14 (solicitation of the claim of Eva Donske) the Commissioner found that neither of these charges was established. Upon our own review of the evidence, we agree. It would, therefore, be futile to detail the very extensive evidence concerning these counts.

The remaining Counts, 17, 18 and 19, all arise out of a collision between two cars in May 1956, south of St. Louis on U. S. Highways 61 and 67. The essential question was,—which driver was on the wrong side of the road, on or near a curve? Elmer LaChance was driving one car north and his passengers were Barney Jones, the latter's wife Beatrice, and Jones' step-son Richard Clemens. Beatrice was killed; LaChance and Jones were seriously injured. LaChance was taken to Alexian Brothers Hospital; Jones to St. Anthony's Hospital. The other car was driven by Carl Henson; his wife was killed, and he was confined to Alexian Brothers Hospital for 6–8 weeks. Count 17 charged the solicitation of LaChance's suit and claim, and the false representation by Respondent to LaChance that he represented LaChance's insurance company. Count 18 charged repeated attempts by Respondent to solicit and procure the claim of Henson, despite the fact that he had already procured LaChance's claim and had, prior to at least a part of the solicitation, already sued Henson. Count 19 charged the solicitation of the claim of Barney Jones, and that therein Respondent failed to advise Jones of a possible conflict of interests. The facts on these counts are long and somewhat complicated, but we must digest them. Essentially, Respondent denied all solicitation in these matters, claim-

ing legitimate references on LaChance and Jones, denying that he ever attempted to get Henson's claim, and testifying that the witnesses' testimony concerning Henson was false.

LaChance testified: that he knew Milton Fox but had "always had" Courtney Goodman; that he had not requested anyone to call Respondent or Fox, nor had he communicated with Respondent. He further testified: that Respondent came to him in the hospital ward shortly after the accident, told who he was, *"said that he was my insurance lawyer,"* talked further to him and got a signed contingent contract; that he did not understand the contents of the contract, for he wasn't "clear" then; that when he asked Downs later why he had said that he was LaChance's "insurance company lawyer," Downs did not answer, but "laughed." Neither Respondent nor Fox claimed at the hearing that he represented The Insurance Company of Texas. Respondent filed suit for LaChance on Monday, May 28, the second day after he got the contract, and eventually settled the case for $10,000. Mrs. LaChance (Virginia Jones) testified: that she learned of the accident, visited her husband and brother, and "called the insurance company" that night, but that she did not ask for a lawyer, nor did she call the office of Respondent or Fox; that she first met Respondent at St. Anthony's Hospital four or five days after the accident, at which time he appeared, "said that he represented Elmer's insurance company" and "he wanted to sign my brother up as his client then"; that her brother, Barney Jones, did execute a contingent fee contract at that time and she, at Respondent's suggestion, wrote a referral statement on the back of it, Respondent then stating, in substance, that this was being done so that people would not think he got Barney's case "out of a newspaper or anything like that." She saw him twice later, and on one occasion he drove her from one hospital to the other. Barney Jones testified: that Respondent came to him in the hospital two or three

days after the accident and said that he'd been over to see Elmer and "came over with my sister" and "he wanted my case," i. e., wanted to represent him; that he, Jones, "signed some papers" and Respondent had his sister sign a slip saying that she recommended him "in case something ever came up about it"; that he had never seen Respondent before, had not asked for him and had asked no one to communicate with him; nor had he asked for Fox. Jones' case was later settled for $18,000.

Respondent's defensive evidence on Counts 17 and 19 was long and involved; it consisted largely of his own testimony and that of Fox. It was stated that Fox represented an "International Motor Club" which furnished certain services for a fee, such as towing, bail bonds, etc.; it did not furnish liability insurance. An insurance agency described as "Friedlander-Graham Agency" sold memberships in that "club" (including one to LaChance) and had also written LaChance's liability insurance in The Insurance Company of Texas. Fox testified that he also represented and was an officer of that insurance *agency;* Respondent testified that he had done certain miscellaneous police court work, etc. at Fox's direction, for members of the motor club; that he was directed by Fox to contact Mrs. LaChance, who supposedly needed "help," that he did so, and later interviewed LaChance, who wanted to hire Fox; that in some way he neglected to put Fox's name into the contract with his own, but that the fee was shared. Fox testified that a call came to his secretary from Mrs. LaChance (the secretary was never produced as a witness) but that there was no record of this call, although there were records of her subsequent calls; that Mrs. LaChance had previously called the insurance agency; that he gave Respondent a memo and sent him out to Mrs. LaChance; he further testified that this "was probably my case," but that the "manner" in which the case was acquired was not his full responsibility; that he thought there was a "mutual association" or division of re-

sponsibility. Similar testimony was given by him with respect to one or more other counts. He testified that Respondent (with reference to LaChance) went out "to investigate the facts and see if he could help Mrs. LaChance, and that he did not direct Respondent to go to LaChance * * *." (At this point we interject that if Respondent improperly solicited the LaChance case, it makes no difference whether he did it at Fox's direction or independently.) The foregoing testimony of Fox appears to be in direct conflict with that of Respondent who testified that: "I was directed by Milton Fox to take a statement and secure a contract from Elmer LaChance," although he also testified that he thought that he was directed to go first to Mrs. LaChance. Peculiarly, an attorney by the name of Courtney Goodman was later brought into this case as co-counsel and he shared in the fee; this was the man whom LaChance testified he had previously had dealings with; we decline to accept the asserted reason given by Fox that Mrs. LaChance requested that Goodman be associated.

Concerning Barney Jones, Respondent testified: that he was directed by Fox to take Mrs. LaChance to see Jones, and to get a statement and contract from him; that LaChance had asked him to see Jones, but that he did not go until directed by Fox; that in fact Jones "solicited us"; that he advised Jones of a possible conflict of interests. Fox testified: that either Mr. LaChance or his wife requested that they visit Jones, but the decision to get Jones' contract was a "mutual decision" between him and Respondent; that, however, the contracts of LaChance and Jones had both been executed before he ever talked to either of them.

As to Count 17, we find that Respondent improperly solicited the claim of Elmer LaChance and procured a contingent fee contract from him; also, that he falsely and fraudulently represented to LaChance that he was LaChance's "insurance lawyer." Such conduct was in violation of Rules 4.27, 4.28 and 4.47. On Count 19, we find that

Respondent improperly solicited the claim of Barney Jones and thereby procured a contingent fee contract. That action was also in violation of the Rules just cited.

In Count 18 Respondent was charged, as already stated, with soliciting the claim of Carl Henson, the driver of the *other* car in the LaChance collision, after he had obtained the LaChance contract, and that at least a part of such solicitation occurred after he had already sued Henson. Henson was in Alexian Brothers Hospital; his wife had been killed. A sister and brother were with him frequently. Respondent filed suit for LaChance against Henson on May 28, 1956, two days after the accident, and procured service on him in the hospital *on the same day*; he also filed suit later for Barney Jones against Henson and had the latter served on June 5th. Carl Henson testified: that within a week after his injury Respondent came to the hospital, left a card with him, introduced himself, "wanted to represent me in the case * *," and said that he knew something about the case, but did not tell him that he represented LaChance; that he told Respondent that he had insurance and was not interested; that he saw Respondent there again later, but did not talk with him; that he subsequently employed another attorney; that he had never seen Downs before and had never asked anyone to communicate with him. It appeared that Henson had executed an affidavit in connection with a motion to quash the service on him, to the effect that he had been unconscious for a period of ten days to two weeks after entering the hospital, and that he was not sufficiently conscious to know that summons had been served upon him. At the Commissioner's hearing Henson testified that he did not remember the service of either summons, that when he executed the affidavit he thought that it was directed to the fact that he did not remember the summons and that he was unconscious at *that* time, and that, in fact, he was conscious at times and unconscious at others, except for the "first few days." Dorothy Farrell, Hen-

son's sister, testified: that she met Respondent in the hall outside Henson's ward about three days after the accident; that he inquired if she was a sister, introduced himself, said that he was a lawyer and that "he would like to represent my brother's case"; that she told him her brother had insurance and was not in condition to see anyone; that a few days later she found Respondent at her brother's bedside, that he again said "he would like to represent my brother" and that she asked him to get out; that at this time her other brother, Leonard, was in the hall; that she had not requested that Respondent or Fox come to the hospital; that her brother (Carl) knew "what he was doing" at times and at other times he did not; that Carl was in a ward with about eight people; that he was unconscious when she first learned that a summons had been left with him. Leonard Henson, a brother, testified that he found Respondent at Carl Henson's bedside about two or three days after the accident, and that their sister then told Respondent to get out; that Respondent told him that he wanted to represent Carl, and he told Respondent that Carl would not be interested in his services; that he saw Respondent at the hospital again about a week later and that he, Respondent, still "wanted the case," but that he told Respondent that if they wanted a lawyer they would get one; that he had not called Respondent or Fox and that he was satisfied that no other member of the family had; that when Respondent was first there his brother's mind would "come and go."

Respondent testified categorically that he did not "seek out Carl Henson in order to secure him as a client"; he further testified: that Carl Henson's testimony was false, that the sister's testimony was false, and that the brother's testimony was false; that he never came to Henson's "bed" and "attempted to secure a contract"; he also denied that he ever talked to the brother Leonard. We do not find that he ever denied being at the hospital, and his testimony does not have the ring of frankness

or truth. Much has been said about Carl Henson's affidavit; his explanation seems reasonable, but even if Carl Henson never talked to Respondent (or if he was unconscious at a time when Respondent tried to talk to him), we find the testimony of the brother and sister to be entirely credible, and that, through them, Respondent was attempting indirectly to solicit Carl Henson in clear violation of Rule 4.27, and also Rules 4.28 and 4.47. Any minor discrepancies here in dates are immaterial. Respondent's conduct was all the more reprehensible in that he was thus soliciting employment from the very man whom he had taken at least one claim *against,* and whom he had already sued and caused to be served with summons; this, of course, was in clear violation of Rule 4.06, in addition to the misconduct of solicitation, per se. It appeared elsewhere in this record that Respondent, although he felt that "everything was conclusive" of Henson's liability, had been unable for a period of at least several weeks to find what he described as an "eyeball" witness who had actually seen this collision; it would seem to be a fair inference that when Respondent approached the Hensons he was attempting to "hedge his bets" on the liability. If he was merely seeking illicit information, he was doing so in the form of a solicitation and, as the Commissioner has well said,—"Those who live by the sword must die by the sword." On Count 18 Respondent is found to be in violation of Rules 4.06, 4.27, 4.28, 4.32 and 4.47.

We have come now to the conclusion of this disagreeable matter. Respondent's age is not stated, but he is apparently in his thirties. He has learned early to adopt a false and vicious view of the law, its real meaning and application, and of our Canons of Ethics; he has *testified* that he was "familiar with the Code of Ethics," that he studied "ethics," and that "I understand these ethics." Based upon the evidence here, we must conclude that Respondent's study and knowledge of ethics, if such he made or had, has been applied only to the perversion of the ethics of the profession. There has been proven here a persistent pattern of solicitation, along with other most serious infractions. If, as Respondent stated to one or more of the law students, *our courts were ever inclined merely to* give such a violator a "slap on the wrist," we trust that those days are gone forever. We have observed no such attitude in the recent actions of our courts. We do not condone the conduct of Respondent in connection with those counts on which he has been held to be not guilty; it is simply our view that those charges were not fully and sufficiently proven.

■ Counsel for Respondent calls attention to several accepted rules applicable in disciplinary cases generally. These are: that the Commissioner's findings are advisory only; that disciplinary proceedings are not pursued for the purpose of punishment; that the power to disbar should be exercised with great caution, and that there is no hard and fast rule; that disbarment should not be ordered where a less severe discipline would accomplish the desired end, or where "there is reasonable hope of reformation." We recognize all of those rules. Counsel's arguments are largely on the facts; we have considered the facts, independently, on each separate count and collectively. On certain counts counsel argues that there was no accomplishment and no "corpus delicti" shown. We have never heard of the theory of "corpus delicti" being applied in a case such as this; its ordinary definition is: "The body of a crime." Black, Fourth Ed. p. 413. Thus, it is suggested that Herd never brought in a case, and that Hemenway, Morris and Hoffman never agreed to carry out Respondent's proposals, etc. Counsel seems to miss the ultimate and essential nature of a violation of the Canons of Ethics. The acts and words of Respondent *in themselves* constitute the violation, demonstrating both the *desire* and *an attempt* to commit the prohibited things and demonstrating, as well, an unfit attitude and mind. The excuse advanced that Respondent used

"poor judgment" is palpably insufficient. The offenses shown here began about the middle of 1957 and continued until about June 1958. Proceedings were instituted before the Bar Committee as early as November 1959 and continued as late as April 1961. There is no statute of limitations in disbarment proceedings. In re Woodward, Banc, Mo., 300 S.W.2d 385. Respondent has had every opportunity, at every step, to present his explanations and defenses, by witnesses, in person, and by counsel.

 In such cases as this it is almost futile to review the authorities, except, perhaps, to glean the guiding principles therefrom. Each case must necessarily stand upon its own facts. We do, however, note here the following, among the comparatively recent cases: In re Randolph, Banc, Mo., 347 S.W.2d 91; In re Sympson, Banc, Mo., 322 S.W.2d 808; In re Oliver, Banc, Mo., 285 S.W.2d 648; In re Woodward, Banc, Mo., 300 S.W.2d 385; In re Conner, Banc, 357 Mo. 270, 207 S.W.2d 492; In re Veach, Banc, 365 Mo. 776, 287 S.W.2d 753; In re Canzoneri, Banc, Mo., 334 S.W.2d 30; In re McLendon, Banc, Mo., 337 S.W.2d 56; In re Gitterman, Banc, 364 Mo. 534, 264 S.W.2d 366. The theme running through these and many other cases is that the primary and ultimate purpose of disciplinary proceedings is to protect the public, the integrity of the Bar, and the courts, from the practice of law by persons unfit to serve as members of the Bar,—and that the courts have "a solemn duty to the public and to the legal profession to enforce the code of ethics governing the conduct of attorneys." Sympson, supra. There is no inherent right to continue in the practice of law, but rather it is a mere privilege which will be withdrawn when one proves himself unfit. Canzoneri, Conner, supra.

Respondent has been found guilty of twelve charges of serious misconduct; he has been found not guilty of those charges where there existed any real, substantial doubt. Our Commissioner concluded, in writing of these cumulative offenses, that: "I can only reluctantly conclude that they show a heart so fatally bent on mischief and such a contemptuous disregard of the Canon(s) of Ethics that for the protection of the public and the Courts, Respondent should be permanently disbarred." We could express our own thoughts no better.

It is ordered that Kenneth Joseph Downs be permanently disbarred from the practice of law, and that his name shall be stricken from the Roll of Missouri Attorneys. All costs are taxed against the Respondent.

All concur.