STATE ex rel. Ingrid CHANDRA, next
friend of Anjali Kathryn
Chandra, Relator,

v.

Hon. Richard P. SPRINKLE, Judge
Circuit Court of Jackson County,
Respondent.

No. 65400.

Supreme Court of Missouri,
En Banc.

Sept. 11, 1984.

Harvey L. Kaplan, Andrew See, Kansas
City, for relator Chandra.

Jennifer A. Gille, Thomas A. Kokoruda,
Suzanne Shank, Thomas N. Sterchi, Sherry
L. Buchli, Robert M. Kroenert, Mark E.

Johnson, Kansas City, for respondent Sprinkle.

RENDLEN, Chief Justice.

Original proceeding in mandamus by which relator Ingrid Chandra, next friend of Anjali Kathryn Chandra, seeks to require the respondent trial judge, in an underlying medical malpractice action, to compel discovery of records of peer review and other committees in the possession of defendant Independence Sanitarium and Hospital. Relator argues the records are relevant to the treatment provided her infant daughter and to evaluation of the facilities and staff of the Hospital's emergency room and, therefore, *are* subject to discovery under Rule 56.[1] The Hospital's position is that the requested documents and information come under a "self-evaluative peer review privilege" and, therefore, *are not* discoverable.

Relator filed suit alleging medical malpractice arising from medical treatment provided her daughter, then a one month old infant, in the emergency room of the Hospital. The allegations presented are as follows: The infant had exhibited worsening symptoms of a cold, respiratory congestion and cough and was taken by her parents to the Hospital's emergency room. The family's pediatrician "on call," defendant Dr. Thomas Hansen, was contacted by telephone at another hospital, told of her condition and he ordered a chest x-ray immediately for the infant. While in the Hospital's X-Ray Department, the child suffered respiratory arrest. Her father, an internist who has staff privileges at the Hospital, administered cardiopulmonary resuscitation, rushed the child back to the emergency room and requested emergency medical treatment.

It is alleged the physician on duty in the Hospital's emergency room, Dr. Mark Ludwig, failed to respond and provide such emergency treatment. Emergency medical equipment used in resuscitation of infants was either unavailable or could not be located by personnel on duty in the emergency room. Dr. Hansen was contacted again by telephone but took no action to insure the child was being provided emergency treatment. Concerned that no physician had responded to the emergency, the infant's father telephoned defendant Dr. Robert Clothier, another of the child's regular pediatricians. Dr. Clothier did not respond personally or take action to insure that the child was being provided emergency medical treatment.

Dr. Hansen arrived at the Hospital's emergency room approximately one hour after the child's respiratory arrest. Upon his arrival, Dr. Hansen neither ordered nor performed emergency medical treatment. An ambulance and attending physician from another facility were called to provide treatment. Relator alleges that as a result of the negligence of the defendant physicians, professional corporations and the Hospital, the infant suffered prolonged and severe cerebral hypoxia (lack of oxygen to the brain) resulting in permanent brain damage, cerebral palsy with seizure disorders, functional blindness and permanently retarded physical and mental development.

Approximately one month following these events, the Hospital appointed an "Ad Hoc Committee," at the request of the infant's father, to investigate and report on the medical treatment provided to the child in the emergency room. Relator has propounded discovery requests to the Hospital seeking information and documents concerning the "Ad Hoc Committee," the factual information it gathered and its conclusions as to the child's treatment. Relator has also requested discovery of records of other Hospital "peer review" and standing committees relevant to the treatment pro-

---

1. Rule 56.01, *General Provisions Governing Discovery,* provides that unless otherwise limited by order of the court, *see* Rule 56.01(c), parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Rule 56.01(b)(1).

vided the infant and concerning the facilities and staff of the Hospital's emergency room. The Hospital has refused to comply with these requests claiming a "peer review privilege." Respondent, Hon. Richard P. Sprinkle, then Judge of the Circuit Court of Jackson County, denied Relator's motion to compel discovery from defendant Hospital. This proceeding in mandamus followed. The preliminary order in mandamus entered November 22, 1983, is now made permanent.

In the absence of a statute establishing a peer review privilege, the critical self-evaluation privilege here asserted by the Hospital "at the most remains largely undefined and has not generally been recognized." *Bergman v. Kemp*, 97 F.R.D. 413, 416 (W.D.Mich.1983) *quoting Lloyd v. Cessna Aircraft Company*, 74 F.R.D. 518, 522 (E.D.Tenn.1977).[2] Nonetheless, the Hospital argues on behalf of respondent for recognition of such privilege, be it absolute or qualified. The Hospital urges that § 537.-035, RSMo 1978,[3] which provides qualified immunity from action for damages for

medical personnel participating in peer review, must be "extended" to protect peer review documents and materials from discovery if the peer review system is to be productive. The Hospital also asserts that this Court is faced with compelling public policy considerations requiring recognition of a peer review privilege. According to the advocates of this privilege, unless the evaluative proceedings are afforded confidentiality, the peer review system will not be effective in maintaining and improving quality health care.

■ Section 537.035 provides no basis for recognition of a peer review "privilege." The legislature has chosen to foster honest peer review by protecting the participants from liability rather than by declaring peer review documents to be privileged from discovery.[4] We are not unmindful of the policy underlying § 537.035. Clothing peer review participants with immunity from liability eliminates their apprehensions of recrimination for good faith appraisal of colleagues' performance and thus removes the major obstacle to beneficial,

---

**2.** Peer review, as the name implies, concerns the professional review and evaluation of health care services. Most hospital peer review is the creature of federal and state licensing and funding requirements. The Joint Commission on Accreditation of Hospitals, the primary accrediting agency in this country, requires the governing body of each accredited hospital to provide for a system of peer review. The actual peer review function is delegated by the hospital to members of its medical staff assisted by hospital administrative personnel. *See* Joint Commission on Accreditation of Hospitals, *Accreditation Manual for Hospitals* (1982).

Missouri has similar peer review requirements in effect in the form of regulations. The chief executive officer of every hospital is responsible to alert the governing body of the hospital, and the chief of its medical staff, to any failure to conform with hospital policies regarding professional standards of medical staff members. State regulations also require that the peer review function be delegated by the hospital to the members of its medical staff and that medical staff members carry out peer review of medical care provided by the hospital. *See* 13 C.S.R. 50–20.021(2) (1982).

**3.** All subsequent references are to RSMo 1978 unless otherwise indicated. Section 537.035 provides, *inter alia,* that no licensed physician, surgeon, dentist, podiatrist, optometrist or phar-

macist shall be liable in damages to any person subject to actions of a peer review committee for any action taken by the committee or by a person acting in his official capacity as a member of such committee when the action was taken within the scope and function of the committee if such action was taken without malice and was supported by credible evidence. The statute provides qualified immunity to these professionals while acting, within the scope of their practice, as authorized members of a peer review committee "functioning for the sole purpose of maintaining the professional standards of those engaged in the practice of the ... professions, or for maintaining professional standards in a hospital ...."

According to a recent survey, thirty-four states, Missouri included, have enacted statutes providing some form of immunity to physicians who participate in the activities of duly constituted review committees. *See* Hall, "Hospital Committee Proceedings and Reports: Their Legal Status," Am.J.L. & Med. 245, 262 n. 53 (1975).

**4.** The privilege of confidentiality, sought here by the Hospital, is separate and distinct from the privilege of immunity from civil liability, established by § 537.035. *See* "Medical Peer Review Protection In The Health Care Industry," 52 Temp.L.Q. 552 (1979).

honest peer review. *See* "Medical Peer Review Protection In The Health Care Industry," 52 Temp.L.Q. 552, 571–75 (1979) and Hall, "Hospital Committee Proceedings and Reports: Their Legal Status," 1 Am. J.L. & Med. 245, 254–64 (1975). The Hospital maintains that the statutory protection providing qualified immunity for committee participants is not enough, and requests this Court to add an additional feature to clothe the records with privilege from discovery not provided by the legislature. It argues the statute must be "extended" beyond its terms to shield all peer review materials from discovery or, at least, to protect the independent opinions of peer review committees; otherwise, it is argued, the peer review system will not be effective in improving the quality of health care. We are not persuaded that the clear language of the statute can be extended to establish the "privilege" requested here, and believe, when the Hospital's public policy argument for confidentiality is measured against relator's right to discovery under Rule 56, the Hospital's public policy argument must fail.

In *Klinge v. Lutheran Medical Center of St. Louis*, 518 S.W.2d 157, 167 (Mo.App.1975),[5] the peer review process was recognized as an analysis system designed to evaluate the quality of medical care. The court expressed the belief the system exists for the benefit *of the public* and those committed to the care of a hospital. "We believe that an internal staff examination . . . assures to the individual patient that degree of professional treatment to which he is entitled and is to the benefit and welfare of the public that the hospital is conducted at a highly professional level." *Id.* It follows from this expression of the public policy underlying the system that it is intended to provide benefit for those presently receiving health care whose care may thereafter be scrutinized by peer review as well as those patients who thereafter come for treatment and whose care may be enhanced by the earlier peer review activity. Can it be said that the knowledge of periodic peer review which may follow the doctors' or Hospital's activities will not encourage improvement of professional conduct? We think not for the system is designed for evaluation and improvement of the health care program for those patients now under care as well as patients in the future. *See* "Medical Peer Review Protection In The Health Care Industry," *supra*. It would appear that the public interest lies with discoverability and not with confidentiality of these records. Claims of privilege present an exception to the usual rules of evidence and are carefully scrutinized. *Ex Parte McClelland*, 521 S.W.2d 481 (Mo.App.1975). Impediments to the discovery of truth are afforded validity in relatively few instances in the common law. *See Nazareth Literary & Benevolent Inst. v. Stephenson*, 503 S.W.2d 177, 179 (Ky.1973). We find no expression of policy in either the general law of evidence or in the statutes according any protection of confidentiality in the situation presented here on public policy grounds.

Rule 56.01(b) provides that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, unless the court otherwise limits discovery in accordance with the rules. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. It should be noted that the hospital has not sought a protective order of the sort that may be available under Rule 56.01(c), but chose instead to assert the "privilege" and our holding here does not reach nor affect the rights of the

---

5. The *Klinge* case considered extension of the physician-patient privilege of § 491.060(5) to use of patients' records in hearings concerning a surgeon's competency conducted by a hospital review committee. The court of appeals held that the privilege set forth in the statute did not obtain under the circumstances of that case because the review procedure exists to benefit the patient and the public. The public's interest in the disclosure of the information was found to outweigh the patient's (and the physician's) interest in concealment.

parties in the discovery process except as to the question of this alleged "privilege."[6] We need not address relator's argument that the hospital has "waived" any privilege by voluntarily conveying defendant Dr. Ludwig's statement before the committee to the child's father and by communicating in a letter the general findings of the committee, *see Bergman v. Kemp, supra,* and *Davidson v. Light,* 79 F.R.D. 137 (D.Colo., 1978), because we hold no peer review privilege exists under Missouri law for factual statements.

The preliminary order in mandamus is made permanent.

HIGGINS, GUNN, BILLINGS and BLACKMAR, JJ., and HOUSER, Senior Judge, concur.

WELLIVER, J., dissents in separate opinion filed.

DONNELLY, J., not sitting.

WELLIVER, Judge, dissenting.

I respectfully dissent. Today, the majority refuses to extend the privilege of confidentiality to medical peer review. In so doing, the majority has closed its eyes to the realities of the delivery of medical services. The majority supports its holding by the observation that the privilege of confidentiality "at most remains largely undefined and has not generally been recognized."[1] In so saying, the majority also closes its eyes to the realities of existing law.

I

Section 537.035 protects participants in the peer review process from liability while remaining silent on the subject of confidentiality of documents and records of proceedings. Section 537.035, however, is not the only relevant statute. Section 197.080, RSMo 1978 provides that:

> The division of health, with the advice of the state advisory council, shall adopt, amend, promulgate and enforce such rules, regulations and standards with respect to all hospitals or different types of hospitals to be licensed hereunder as may be designed to further the accomplishment of the purposes of this law in promoting safe and adequate treatment of individuals in hospitals in the interest of public health, safety and welfare.

Pursuant to this statute, the State Board of Health has promulgated regulations:

> 8. The organized medical staff shall meet at least once each six (6) months. A mechanism shall be established for monthly decision-making by or on behalf of the medical staff.
>
> 9. Written minutes shall be signed and permanently filed on a confidential basis in the hospital.
>
> 10. The medical staff as a body or through committee shall review and evaluate the quality of clinical practice of the staff throughout the hospital at least once each quarter. Such review and evaluation shall include selected deaths, unimproved cases, tissue, infections, complications, errors in diagnosis, and results of treatment.

13 C.S.R. 50–20–20.21(2)(C).8, .9, .10. The review of individual histories and records required by the regulations cannot be interpreted to be other than peer review in its purest form. The more significant feature of the regulations is their express recognition of the privilege of confidentiality, even for routine staff meetings. No one could suggest that these regulations constitute

---

**6.** Use of the protective order has been discussed in other peer review cases. *See Wesley Medical Center v. Clark,* 234 Kan. 13, 669 P.2d 209 (1983); *Nazareth Literary & Benevolent Inst. v. Stephenson, supra; Kenney v. Superior Court,* 255 Cal.App.2d 106, 63 Cal.Rptr. 84 (1967).

**1.** The majority quotes language originally from *Lloyd v. Cessna Aircraft Company,* 74 F.R.D. 518 (E.D.Tenn.1977). This case involved the question of whether a privilege exists for information concerning a corporation's top ten list. *Id.* at 521. The court declined to create a privilege, but it noted that it would apply a balancing test when considering the discoverability of the minutes of confidential corporate meetings. *Id.* at 522. Thus, the majority's use of this case is wholly misguided.

an inappropriate use of the regulatory power delegated by the statute.

In modern day hospitals, peer review is not only a prerequisite to accreditation, but it is also a requirement precedent to receipt of many federal funds. *See generally* Holbrook & Dunn, "Medical Malpractice Litigation: The Discoverability and Use of Hospitals' Quality Assurance Committee Records," 16 Washburn L.J. 54, 57–58 (1976). Courts, legislatures and commentators have almost universally recognized that confidentiality is essential to the medical peer review process. In the seminal case of *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.C.D.C.1970), the United States District Court in the District of Columbia recognized a peer review privilege under federal law. That court aptly observed:

> Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.

Other federal courts have followed the persuasive reasoning in *Bredice.*[2] Similarly, Florida courts have acknowledged that "[t]he arguments in favor of confidentiality of the records and proceedings of a medical review committee are so compelling that discovery should be allowed only in the most necessitous circumstances." *Segal v. Roberts,* 380 So.2d 1049, 1052 (Fla.App.

1979); *Dade County Medical Association v. Hlis,* 372 So.2d 117, 120 (Fla.App.1979). When construing one of its state's statutes, the Washington Supreme Court observed:

> The discovery protection granted hospital quality review committee records, like work product immunity, prevents the opposing party from taking advantage of a hospital's careful self-assessment. The opposing party must utilize his or her own experts to evaluate the facts underlying the incident which is the subject of suit and also use them to determine whether the hospital's care comported with proper quality standards.
>
> The discovery prohibition, like an evidentiary privilege, also seeks to protect certain communications and encourage the quality review process. Statutes bearing similarities to RCW 4.24.250 prohibit discovery of records on the theory that external access to committee investigations stifles candor and inhibits constructive criticism thought necessary to effective quality review. Courts determining that hospital quality review records should be subject to a common law privilege have advanced this same rationale.

*Coburn v. Seda,* 101 Wash.2d 270, 677 P.2d 173, 176 (1984). The Arizona Supreme Court also opined that "[t]he protection is justified by the overwhelming public interest in maintaining the confidentiality of the medical staff meetings so that the discussion can freely flow to further the care and treatment of patients." *Tuscon Medical Center, Inc. v. Misevch,* 113 Ariz. 34, 545 P.2d 958 (1976). *Cf. Lipschultz v. Superior Court,* 128 Ariz. 16, 623 P.2d 805 (1981). Other courts echo the observations of the Arizona and Washington Supreme Courts.[3] Only a few state supreme courts have declined to adopt judicially any form of a peer

2. See, e.g., *Davidson v. Light,* 79 F.R.D. 137 (D.Colo.1978); *Gillman v. United States,* 53 F.R.D. 316, 318–19 (S.D.N.Y.1971).

3. See, e.g., *Beth Israel Hospital & Geriatric Center v. Franco,* 683 P.2d 343 (Colo.1984); *Eubanks v. Ferrier,* 245 Ga. 763, 267 S.E.2d 230,

233 (1980); *Jenkins v. Wu,* 102 Ill.2d 468, 82 Ill. Dec. 382, 468 N.E.2d 1162 (Ill.1984) [decided May 25, 1984]; *Oviatt v. Archbishop Bergan Mercy Hospital,* 191 Neb. 224, 214 N.W.2d 490, 492 (1974).

review privilege.[4] In short, the overwhelming majority of courts, whether interpreting a state statute, broadly construing an existing state statute or judicially adopting a peer review privilege, recognize that some degree of confidentiality is essential in order to preserve the integrity and candor needed in the peer review process.

This strong public policy is illustrated by the fact that at least forty-six states have legislatively provided for varying degrees of protection of the peer review process.[5] When interpreting these statutes, courts have construed them broadly in order to effectuate this public policy.[6]

Commentators are in apparent agreement that the peer review privilege is necessary to ensure candor in the delivery of health care services. One author who criticizes the extension of the peer review privilege to situations outside the medical and academic professions strongly argues in favor of the privilege for medical peer reviews:

> Protection against disclosure of medical reviews sought in malpractice cases is easily justified. A failure to ensure confidentiality will diminish the quality of the reviews. Furthermore, the use of the conclusions of such reviews in litigation renders the peer reviews involuntary experts for one of the parties. Production of the self-study is unnecessary if the factual basis of the peer review is discoverable from other sources because the parties can retain their own experts

to evaluate the facts and draw conclusions from them.

Flanagan, "Rejecting a General Privilege of Self-Critical Analyses," 51 Geo.Wash.L. Rev. 551, 576 (1983). Indeed, Flanagan notes that "medical peer reviews historically have been confidential, and most authorities would agree that they would not be performed without such confidentiality." Id. at 574. See also Note, "The Privilege of Self-Critical Analysis," 96 Harv.L.Rev. 1083 (1983).

In addition to any statutory authorization, this Court has the inherent power to regulate discovery, and protecting the public interest has long been recognized as a reason for not permitting inquiry into certain matters by way of discovery. 4 J. Moore & J. Lucas, Moore's Federal Practice ¶ 26.60[3] (2d ed. 1982). Perhaps the best approach for determining when the public interest demands that a communication remain confidential is the four-pronged test established by Professor Wigmore. First, there must be a communication between parties made with the understanding that the communication be kept confidential. Second, confidentiality must be essential to the maintenance of the relationship. Third, the community must encourage the relationship. Fourth, disclosure would injure the relationship more than it would benefit society. 8 Wigmore, Wigmore on Evidence § 2285 (J. McNaughton rev. ed. 1961).

> While there may be instances where peer review committee minutes and records and other confidential hospital documents should be denied discovery under the broad supervisory powers of the court, we decline to adopt an absolute statement of public policy declaring all such records to be protected in toto.

Id. at 219. Even the court in Wesley did not hold that no privilege would exist, only that no absolute privilege should be judicially created.

**4.** See, e.g., Kenney v. Superior Court, 255 Cal. App.2d 106, 63 Cal.Rptr. 84 (1967); Wesley Medical Center v. Clark, 234 Kan. 13, 669 P.2d 209 (1983); Nazareth Literary & Benevolent Inst. v. Stephenson, 503 S.W.2d 177 (Ky.1973); Shibilski v. St. Joseph's Hospital, 83 Wis.2d 459, 266 N.W.2d 264 (1978); Davison v. St. Paul Fire & Marine Inc., Co., 75 Wis.2d 190, 248 N.W.2d 433 (1977). The more recent of these cases, Wesley, best illustrates the position of these courts. In Wesley, the Kansas Supreme Court opined that disclosure would not affect the candor necessary for the functioning of medical staff meetings. The court however, still recognized that disclosure should be controlled and it therefore adopted a balancing test to be applied on an ad hoc case-by-case basis. 669 P.2d at 214–19. The court continued:

**5.** Wesley, supra, at 217.

**6.** See, e.g., Franco v. District Court, 641 P.2d 922, 930 n. 10 (Colo.1982); Posey v. District Court, 196 Colo. 396, 586 P.2d 36 (1978); Mennes v. South Chicago Community Hospital, 100 Ill. App.3d 1029, 56 Ill.Dec. 547, 427 N.E.2d 952 (1981).

Application of these four characteristics to the medical peer review process dictates that a privilege should exist. First, the communications made among the doctors and other staff personnel are made with the understanding that they will be kept confidential. Second, confidentiality is essential to the maintenance of a frank and open peer review process. Common sense suggests that opening up the peer review process to the multitude of malpractice victims will indirectly, if not directly, affect the manner in which medical personnel criticize or evaluate their colleagues. Third, the community naturally encourages this relationship—that is, the peer review committee—because it fosters critical self-evaluation within the medical profession. This self-evaluation leads to improvement in the delivery of health care services, and "[a]n effective medical staff review process is essential if the medical profession and the hospital are to meet their increased responsibilities to the community." Hall & Hyg, "Hospital Committee Proceedings and Reports: Their Legal Status," 1 Am.J. of L. & Med. 245, 281 (1975). The fourth, and crucial, question is whether disclosure would injure society more than it would benefit society. The majority opinion correctly suggests that this requires balancing two conflicting public policies: the public policy favoring liberal discovery and the public policy favoring improvement in the delivery of health care services.

This fourth criteria necessarily involves a balancing of interests and an empirical determination,[7] but I am not persuaded by the majority view that "the Hospital's public policy argument" must fail when "measured against relator's right to discovery under Rule 56." If discovery is allowed in cases such as this one, the peer review process will most likely suffer. No longer will frank and open discussion be the hallmark of the successful peer review; the constant threat of lawyers scouring the pages of a peer review file will chill the candor of peer review participants. At the very least, peer review participants will learn to choose each phrase or opinion with the utmost of care, lest they endanger a colleague; minor constructive criticism might give way under the lingering dark cloud of a malpractice action. Should discovery not be allowed, the malpractice victim, on the other hand, suffers very little. The rules governing liberal discovery are designed to ensure that a litigant can determine all the facts in issue before the trial. *Bethell v. Porter*, 595 S.W.2d 369, 377 (Mo. App.1980); *Central and Southern Truck Lines, Inc. v. Westfall GMC Truck, Inc.*, 317 S.W.2d 841 (Mo.App.1958). Denying the litigant access to the information sought in this case does not hinder the litigant's ability to determine all the facts in issue. The litigant may obtain medical records, depose witnesses and have his or her own experts evaluate and comment upon the disclosed facts and circumstances. Thus, the malpractice victim suffers only minimally from nondisclosure, while the medical profession suffers greatly from disclosure.

The four requirements for a privilege being clearly satisfied, no compelling reason exists why this Court should not acknowledge the vast array of persuasive authority and recognize the confidentiality privilege of medical peer review.

Another phase of this matter causes me deep concern. While the majority finds it so difficult to recognize the public's interest in peer review in the medical profession, the legal profession and the judiciary have never experienced the same difficulty with reference to our own peer review. We have always recognized that discipline of lawyers for the purpose of assuring a higher quality of legal services is in the public interest. *See, e.g., In re Downs*, 363 S.W.2d 679 (Mo. banc 1963); *Hoffmeister v. Tod*, 349 S.W.2d 5 (Mo. banc 1961). Our Rule 5.10 creates a committee of "not less

---

7. When balancing certain interests we cannot avoid making an empirical judgment, and as Justice Blackmun recently noted in *United States v. Leon*, —— U.S. ——, ——, 104 S.Ct. 3405, 3424, 82 L.Ed.2d 677 (1984) (Blackmun, J., concurring), "we cannot escape the responsibility to decide the question before us, however imperfect our information may be."

than four lawyers" in every judicial circuit of the state who are charged by Rule 5.12 "to investigate in a summary and informal manner, any professional misconduct alleged to have been committed within its judicial circuit." Surely no one can dispute that the legal profession is utilizing peer review. The irony is that the legal profession has been quick to accord its peer review proceedings with a cloak of confidentiality. Rule 5.24 specifically closes the records of our peer review hearings until such time as they become public records in a court proceeding or until otherwise ordered by this Court. I am unable to perceive why a legal peer review is entitled to more protection than a medical peer review or why a medical malpractice victim is entitled to more information than a legal malpractice victim, unless it be the interest of the lawyers in both.

## II

Another aspect of this case also deserves comment. For some time, I, along with many others, have had a growing concern as to whether amicus curiae are "friends of the Court" or "friends of one party" having a special axe of their own to grind. In *Sermchief v. Gonzales*, 660 S.W.2d 683 (Mo. banc 1983), I noted that the case attracted amici briefs resembling a "letter writing campaign directed at a legislative body" and called for promulgation of a rule regulating their submission. Many writers have indicated a similar concern.[8]

While this case and its companion case were pending, I became acutely aware of the need for our own Court to take steps to regulate amicus briefs and appearances. In this case, as is our customary practice, the Court freely permitted the filing of amicus suggestions or briefs. By agreement of the parties, amicus were also permitted to participate in argument of the case. It would be hard to say that the amicus briefs and arguments were of no benefit, but it might be equally hard to say

that they were of special benefit to the Court in cases so thoroughly briefed and argued by the parties.

During the pendency of these cases, the Court in *Fowler v. Park Corporation*, 643 S.W.2d 749 (Mo. banc 1984) summarily denied the right to file suggestions as amicus curiae to the Missouri Automobile Dealers Association; the Car and Truck Rental and Leasing Association of Missouri; Mercantile Bancorporation, Inc.,; Centerre Bancorporation, Inc.; Boatmen's Bancshares, Inc.; Terminal Railroad Association of St. Louis; Atchison, Topeka, and Santa Fe Railway; Burlington Northern Railroad; Chicago and North Western Transportation Co.; Chicago, Milwaukee, St. Paul and Pacific Railroad; Illinois Central Gulf Railroad; Kansas City Southern Railway Co.; Missouri-Kansas-Texas Railroad; Missouri Pacific Railroad Co.; Norfolk and Western Railway Co.; St. Louis Southwestern Railway Co.; and Kansas City Terminal Railway Co. Whether this Court ultimately decides to deny all amicus curiae, except those invited by the Court; or, to freely permit all amicus curiae, as has generally been done in the past; or, promulgate a rule, I would urge that this Court as an interim policy permit amicus curiae only where both party litigants agree or where invited by the Court of its own motion. This policy can assure fairness to all parties and to the Court until such time as this Court shall take specific action by promulgating a rule.

## III

In summary, I do not believe that the mere fact that otherwise discoverable documents and records become a part of the record in medical peer review clothes them with any privilege of confidentiality not heretofore accorded under existing law. Continued delivery of high quality medical services now enjoyed in this country mandates that we accord to medical peer re-

---

**8.** Flanagan, "Amicus: A Friend or A Foe?," National Law Journal, Nov. 14, 1983; O'Connor & Epstein, "Court Rules and Workload: A Case Study of Rules Governing Amicus Curiae Participation," 8 Justice System Journal 35 (1983); Kurland, Hutchinson & Benson, "Too Many Friends of the Court," 70 ABA Journal 16 (August 1984).

view the same degree of privilege of confidentiality that we accord to our own profession in our efforts to ensure delivery of high quality legal services. Our statutes and regulations so intend. But, whether they do or not, we have the inherent power to grant the privilege.

I would quash the preliminary writ of mandamus.