No. 19,061.

J. B. ARMSTRONG, *Appellee,* v. THE TOPEKA RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. PRIVILEGED COMMUNICATIONS—*Construction of Statute.* Statutes in derogation of the competency of witnesses will not be enlarged by implication or interpretation, but will be strictly construed in favor of competency.

2. SAME—*Statute Not Remedial but Merely Grants a Privilege.* The statute rendering physicians and surgeons incompetent to testify to certain communications made to them by their patients is not remedial in any proper sense of the term, but merely grants a privilege to persons in a specified relation, if they see fit to take advantage of it.

3. SAME—*Nature of Communications Included in Statute.* Section 323 of the civil code, relating to privileged communications to physicians and surgeons with reference to physical disease, was amended in 1909 (new code, § 321), to include communications respecting physical defects and injuries, and the time, manner and circumstances under which ailments were incurred. The time, manner, and circumstances of, for example, a street-car accident resulting in injury to a passen-

ger are not confidential in their nature, there being no secrecy, or intimacy, or privacy about them. They may be classified as confidential only because associated with or incident to confidential matters, and the statute is to be interpreted as including such facts merely for the protection of genuinely confidential subjects.

4. SAME—*Physician May Testify with Consent of Patient.* A physician may testify to confidential communications with the consent of his patient. The giving of testimony by the patient without objection is by statute made the equivalent of consent that the physician may testify to the same subject matter, whether the patient be willing in fact or not. Besides this statutory consent, consent may be express, as, for example, by contract. Consent may also be implied. It is implied from failure to make objection when the physician is called upon to testify, assuming that the patient has opportunity to make objection.

5. SAME—*Patient May Waive His Privilege Under the Statute.* Under the facts stated at length in the opinion it is held that the plaintiff, who claimed to have been injured by being violently thrown from a moving street car because of a sudden jerk and starting of the car, and who was attended by a number of physicians, waived his right to have his communications to them respecting the manner and circumstances of his injury regarded as privileged. *Held,* further, that since the plaintiff has waived his privilege it no longer exists, and will not be a factor in subsequent proceedings in the case.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed December 12, 1914. Reversed.

*Leonard S. Ferry, Thomas F. Doran,* and *John S. Dean,* all of Topeka, for the appellant.

*Edwin E. Brookens,* and *Edwin D. McKeever,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff sued the defendant for damages resulting from personal injuries which he alleged he sustained through the negligent operation of

one of the defendant's street cars.   The plaintiff recovered and the defendant appeals.

The petition alleged that the plaintiff was thrown violently from a slowly moving car on which he was a passenger because of the fact that the motorman suddenly started the car just as it was about to stop at the plaintiff's destination, and just as he was about to alight from it, but before he had succeeded in doing so.   The plaintiff, who is a physician, testified as follows:

"Q.   Now, you may state just what happened? A.   Well, when I got to the Rock Island depot, I passed right in through the car and went around the part where the conductor stands.   Just as I went by I said, 'Next crossing,' and he jerked the cord, and I went around and stepped right past him and down on the step, standing on my left foot, holding to that rod, and the car was coming down real slow and slipped my foot along, probably within three or four inches of the pavement, expecting to get off just when it stopped, and it was just a little, possibly, past the McCord-Kistler Grocery Company and the car suddenly—the motorman gave it a couple of jerks and the car started forward, and I had my obstetrical grip, and it threw me around backward and I lighted solid on my heels, and at the same time felt as though some real sharp instrument had struck me in the small of my back."

The grip which the plaintiff carried weighed about twenty-five pounds.   He was not thrown down.   The occurrence did not attract the attention of the conductor of the car or, so far as known, of any one else, and the plaintiff alone was aware that the incident included features which distinguished it from the commonplace stepping from a slowly moving street car.

The incident which the plaintiff described occurred on Saturday morning, August 3, 1912.   On Monday the plaintiff requested Doctor Bowen to treat him for lumbago, which he supposed he had as the result of a wrench of his back, and he went to Doctor Bowen's office for that purpose.   He was met there by Doctor Kiene, who was able to afford him some temporary

relief. On Tuesday the plaintiff again called at Doctor Bowen's office, where he was treated, and Doctor Bowen then took the plaintiff to his home in North Topeka. The plaintiff remained at home, suffering great pain and in a paralyzed condition, for some three weeks, when he was taken to Kansas City, Mo., for treatment by Doctor Grover Burnett. He remained at Kansas City four weeks, and at the end of that period, his condition having improved somewhat, he returned to Topeka. From the time the plaintiff was taken to his home by Dr. Bowen he was under the care of his regular physician, Doctor Sams. Because of the puzzling character of the case many other physicians were called to see the plaintiff, and came to see the plaintiff. Doctor Bowen called in Dr. W. S. Lindsay, a specialist in nervous diseases, who afterwards gave much attention to the case. Before the trial he and Doctor Porter, a member of the staff of the St. Francis Hospital, were appointed by the court to examine the plaintiff and report upon his condition. Doctor Lindsay called Doctor Milne, a specialist of Kansas City, Mo., and also took his son, Dr. Merrill Lindsay, to see the plaintiff. Doctor Sams called Doctor Burnett, who came from Kansas City to visit the plaintiff some four or five days after his injury. Doctor Johnson, of Topeka, was present on this occasion, at whose request does not appear. Doctor Joss, and perhaps some other physicians of the city called to see the plaintiff for the purpose of observing his condition, both as a matter of interest to themselves and for the purpose of lending assistance if they could.

At the trial the plaintiff was the first witness examined. Besides giving the testimony which has been quoted, the plaintiff gave a full account of his case, including a detailed description of his physical condition, of the nature and progress of his disease, of the methods of examination employed by some of the physicians who attended him, and in part of the treatment he

received.   Besides this, as a medical expert, the plaintiff attributed his disorder to a hemorrhage of the spinal cord, caused by the wrench and shock which he received when he struck the pavement on his heels after having been thrown violently from the defendant's car.

On cross-examination the plaintiff was asked if he had not given an account of how he was injured to Doctors Kiene, Bowen, Sams, Lindsay, Merrill Lindsay and Milne.   He admitted having given a history of his case to Doctors Kiene, Bowen, Sams and Lindsay.   He was quite certain he had not stated the facts to Doctor Milne, but was not certain that Dr. Merrill Lindsay had not heard him do so.   Sometimes, but not always, objections were interposed to the questions asked, on the ground that they called for privileged communications, and the substance of some of the conversations was given, partly without objection and partly over objection.

At the conclusion of the plaintiff's testimony his wife was called to prove his previous robust health. The plaintiff's last witness in chief, Doctor Burnett, was then called.

Doctor Burnett testified to coming to Topeka to see the plaintiff and to a personal examination of the plaintiff at his home to ascertain the nature and cause of his malady.   The facts disclosed by this examination were stated in detail.   In answer to a hypothetical question, the witness gave an opinion coinciding with the opinion which the plaintiff himself had expressed as to the traumatic origin of the plaintiff's paralysis.   On cross-examination the witness amplified his statement of the knowledge of the plaintiff's physical condition which he had gained by personal examination.   He further testified that his opinion was based not only upon his personal examination of the plaintiff, but also upon the history of the case which he had received from the plaintiff and Doctor Sams, and he gave reasons why the history of the case was important in this instance.   After

32—93 KAN.

his opinion had been withdrawn from the consideration of the jury and after he had again been qualified, he changed the basis of his opinion to conform to the ruling of the court, and said he rested his opinion, which remained unchanged, on the condition in which he found the plaintiff.

The witness received the history of the case when he first examined the plaintiff on the occasion of his visit to Topeka. He remembered that Doctor Sams, Doctor Johnson, and Doctor Bowen were present at the time. He did not remember about Doctor Kiene or Doctor Joss, and was quite certain that Doctor Lindsay was not there. The meeting took substantially the form of a consultation. A portion of the testimony of the witness follows:

"Q. At the time that you examined him, did Doctor Armstrong give you a history of his case? A. Why, I think so, in a reasonable way.

"Q. He told you about this accident, did he? A. He told me about getting off the car; yes, sir.

"Q. And the manner in which he got off the car? A. Yes; said that in getting off the car it was moving faster than he thought it was and he came down on his heels hard—his full weight—with his muscles set stiffly.

"Q. Did he say anything about the car jerking and throwing him off. A. No—

"Q. Never said anything about that car jerking him? A. No, I don't remember of it.

"Q. Just stepped off the car. Did he tell you that he had a grip in his right hand? A. I am not sure about that.

"Q. Did he tell you he was standing on the lower step? A. He said he went to step off the car—

"Q. And come down heavy on his heels? A. Yes.

"Q. Did he tell you how high above the pavement he was when he undertook to step off? A. I don't know as he estimated any distance, but as I recollect in speaking about it, was rather high step.

"Q. Did he not tell you the car was going very slowly? A. Said it was going faster than he thought it was, as I remember it.

"Q. Now, doctor, he gave you what was supposed to be the history of his case, did he not? A. I think as well as he could.

"Q. As well as he could. It is customary for you doctors to inquire into the history of the case before you diagnose the case is n't it? A. Yes, sir."

Later the witness testified as follows:

"Q. My understanding of your testimony then is, doctor, that while this condition which affects Dr. Armstrong might result from an injury, it may result from numerous other causes. A. Well, that would depend on how much you robbed the case of certain facts.

"Q. Don't rob it of any facts, just let it go as it is. A. Then I would say that is not true.

"Q. I understand you to say that any disease which would break down certain parts of the spinal cord would produce it? A. But I did n't understand you to specify Dr. Armstrong when you asked that question.

"Q. Why do you single out Dr. Armstrong? Is it because you have heard the history of his particular case? A. Because of the facts that were given in connection with his case as a cause.

"Q. As a cause? A. Yes, sir.

"Q. Who gave you those facts, doctor? Did he, himself, and those around him? A. Dr. and Dr. Sams together both gave me the facts of it.

"Q. Gave you the history? A. In fact I think they gave it all to me."

The foregoing testimony was all given without any objection that the communications disclosed by it were confidential, and indeed without any objection whatever. Later in his examination Doctor Burnett sought to discount the information he had received from the plaintiff and from Doctor Sams, but the jury returned the following special findings of fact relating to the matter:

"Q. 2. How fast was the car going when the plaintiff alighted from it. A. 2. The evidence shows that it was moving about as fast as a man would walk, and suddenly lurched forward.

"Q. 3. Did not plaintiff tell Dr. Burnett, in stating to him the history of his case, that he stepped off the car

while it ·was in motion and that it was going faster than he thought it was? A. 3. Yes, but did not say that he voluntarily stepped off.

"Q. 4. In telling Dr. Burnett how he stepped off the car while in motion, did the plaintiff tell him anything about the car being started forward with a jerk throwing him off? A. No."

The defendant introduced testimony, including that of the commissioners appointed by the court, to the effect that the fall described by the plaintiff could not injure the encased and protected spinal cord of a robust man, such as the plaintiff was, having healthy blood vessels and healthy tissues, in such a way as to produce a hemorrhage, and that the plaintiff was suffering from the effects of an inflammation of the anterior horn of the gray matter of the spinal cord, known as poliomyelitis, a disease which is infectious and not traumatic in origin.

The defendant offered to show by physicians, who were present when Doctor Burnett made his examination of the plaintiff, and by other physicians, the history of the accident to the plaintiff as they had received it from him. The offers were rejected on the ground that they called for the revelation of privileged communications. A sufficient number of affidavits were taken for use at the hearing on the motion for a new trial to indicate the nature of the offered evidence, and the affidavits of Doctor Kiene, Doctor Bowen, Doctor Lindsay, and Doctor Merrill Lindsay show that when the plaintiff accounted to them for his condition he said he stepped off the car before it reached its stopping place, and he made no reference to any jerk or to any sudden starting of the car or to being thrown from the car.

The foregoing statement presents enough of the record to develop the single subject which will be considered, the propriety of the rulings of the court rejecting the evidence to which reference has just been made.

Armstrong v. Street Railway Co.

If the rulings were erroneous they were prejudicial. If the plaintiff stepped from the car before it reached its stopping place and there was no jerk or sudden start of the car, he acted voluntarily and the defendant was not guilty of negligence. The fact that the plaintiff told Doctor Bowen, whom he first called, and Doctor Kiene, who first treated him, that he stepped from the car before it reached its stopping place and left out of his statement all reference to a sudden jerk or lurch or sudden start of the car, which threw him off, would indicate that negligence on the part of the defendant first assumed importance when an action for damages was contemplated. While the jury might in fairness believe that the account given Doctor Burnett was abbreviated or fragmentary, they could not have failed to be impressed with the fact that the plaintiff's story to other physicians, related while the episode was fresh in his memory and while restoration to health was the only consideration, contained no charge of misconduct on the part of the defendant. The plaintiff's hypothetical questions to the medical experts included the fact of a violent throwing of the plaintiff to the pavement by a sudden jerk or start of the car. With sudden and unexpected violence in alighting from the car eliminated, perhaps the defendant's theory of the plaintiff's disease would have been accepted by the jury.

Previous to the revision of 1909, the section of the civil code relating to privileged communications to physicians read as follows:

"The following persons shall be incompetent to testify. . . .

"*Sixth.* A physician or surgeon, concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient: *Provided,* That if a person offer himself as a witness, that is to be deemed a consent to the examination also of an attorney, clergyman or priest, physician or surgeon on the same subject." (Gen. Stat. 1901, § 4771, Civ. Code, § 323.)

By the revision of 1909, section 323 of the code became section 321, which now reads as follows:

"The following persons shall be incompetent to testify. . . .

"*Sixth,* a physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred, or concerning any knowledge obtained by a personal examination of any such patient, without the consent of the patient.

"But if a person without objection on his part testifies concerning any such communication, the attorney, clergyman, priest or physician communicated with may also be required to testify on the same subject as though consent had been given within the meaning of the last three subdivisions."

It is well understood that communications between physician and patient were not privileged at common law, and in this country the privilege is the creation of comparatively recent statutes. The basis of the privilege is the likelihood that persons may be deterred from consulting physicians with respect to their physical condition or state of health if a disclosure of their confidential communications can be compelled in court, and the likelihood that more harm may result from being reticent to consult a doctor than from the suppression of the truth in court. How much this theory is the result of speculation and sentiment and how much the result of observation and experience need not be discussed, since the legislature has embraced it and acted upon it.

In an opinion interpreting the old statute the court said:

"The statute quoted contemplates that the patient may consent to his physician's testifying. Therefore no question of public policy is involved. The public policy of the state does not depend upon the will of individuals who are free to act as circumstances may suggest them. It is elementary law that communications made in professional confidence are not incom-

petent. If a third person hear them he may testify. The disqualification is imposed upon the lawyer, physician or priest only, and not for his benefit or for the benefit of the public, but merely as a privilege to the client, patient or person confessing. This privilege, like many others, even those protected by constitutional guaranty, may be waived. By statute if the party himself testify the privilege is waived. If he publish the confidential matter to the world the privilege is waived." (*Insurance Co. v. Brubaker*, 78 Kan. 146, 155, 96 Pac. 62.)

The time, manner, and circumstances of a street-car accident are not confidential facts. There is no secrecy, or intimacy, or privacy about them. (4 Wigmore on Evidence, § 2380), and nothing a legislature can do can change their actual character. It may be assumed, however, that the legislature may arbitrarily classify them with confidential matters with which they may be associated. The court will not assume that the legislature added the time, manner and circumstances of personal injuries to the exemptions contained in the old law for the purpose of fostering any damage-suit industry, or for the purpose of gratifying the desires of members of the medical profession to keep their relations with patients free from the probe of judicial inquiry. On the other hand, it will be assumed that the amendment was made in the same spirit in which the original statute was conceived, that is, for the protection of genuinely confidential matters. The statute is not remedial in any proper sense of that term, as some courts would hold, but merely grants a privilege to persons in specified relations if they see fit to take advantage of it; and the terms of the statute will not be extended by implication or by interpretation, but will be strictly construed in favor of the competency of witnesses. (*Mendenhall v. School District*, 76 Kan. 173, 90 Pac. 773; *Hess v. Hartwig*, 83 Kan. 592, 112 Pac. 99; *Treiber v. McCormack*, 90 Kan. 675, 678, 136 Pac. 268; *Thurston v. Fritz*, 91 Kan. 468, 475, 138 Pac. 625.)

The statute provides that a physician shall be incompetent to testify to communications made to him by his patient without the consent of the patient. Of course, the physician may testify with the consent of the patient. The giving of testimony by the patient without objection is by statute made the equivalent of consent that the physician may testify to the same subject matter, whether the patient be willing in fact or not. Besides this statutory consent, consent may be express, as, for example, by contract. Consent may also be implied. It is implied from failure to make objection when the physician is called upon to testify, assuming, of course, that the patient has opportunity to make objection.

There is good ground for holding that the plaintiff consented under the statute that some of his physicians might testify to his communications to them relating to the manner and circumstances of his injury, by giving testimony himself without objection concerning these communications.

As indicated in the statement of facts, when the plaintiff was asked about what he had told his various physicians frequent objections were made on the ground of privilege. Sometimes objection was not made until the subject had been well opened up. Sometimes after an objection was made the examination was allowed to proceed a considerable length before another objection was interposed. Sometimes the answers of the plaintiff were distinctly to his own advantage. The defendant clearly had the right to ask the plaintiff if he had given his various physicians accounts of how he came to be injured. He rested under no incompetency, statutory or otherwise. On receiving affirmative answers, the defendant could, with perfect propriety, ask for such accounts because the plaintiff might consent at any time to waive his privilege. If he did not desire to do so it was incumbent upon him to make the fact plain by entering specific objections. Apparently the plaintiff was somewhat undecided as to

how vigorously and how persistently he would urge his privilege. He objected when he wished and kept silent when he wished, and it can not be said that he made it clear to the court that he stood rigidly upon his privilege, objecting to every inquiry regarding his communications to his physicians and desisting from making objections only to avoid the appearance of being pertinacious. That such was not in fact his attitude before the court becomes quite evident when the subsequent proceedings are considered. Doctor Burnett was the plaintiff's chief witness. During the cross-examination of Doctor Burnett the plaintiff kept silent and permitted the witness to recount, without objection, all the facts he could remember of learning from the plaintiff relating to the manner and circumstances of his injury. These facts were obtained from the plaintiff at a consultation participated in by a number of physicians, all of whom were released from incompetency to testify to matters occurring at the consultation whenever Doctor Burnett was allowed to divulge them. No motion was made to strike out Doctor Burnett's testimony. It was made the basis of special findings of the jury, and its admission necessarily constituted a very broad waiver of the plaintiff's privilege. When the defendant's side of the case was reached objections were again forthcoming and were made incessantly to the end of the trial; but it was only after the defendant's side of the case had been reached that the plaintiff determined to insist firmly on his privilege, and fear of being regarded as pertinacious did not then trouble him.

Summarizing the entire proceeding, it shows that the plaintiff consented under the statute that conversations with some of his physicians relating to the manner and circumstances of his injury might be inquired into, by testifying without objection to some of the details of such conversations. Doctor Burnett acquired knowledge of the plaintiff's physical condition and

disease by personal examination of the plaintiff and by learning the history of the case from the lips of the plaintiff. The plaintiff consented in fact to a disclosure of this knowledge by calling upon Doctor Burnett to testify as a witness for the plaintiff to every detail of such knowledge. The plaintiff consented in fact to a disclosure by Doctor Burnett of the manner and circumstances under which his ailment was incurred by not objecting to Doctor Burnett's cross-examination. The door of the plaintiff's room was opened wide upon a consultation of his physicians, and the plaintiff himself went upon the witness stand and made a full disclosure of his physical condition, of his supposed physical injury and disease, and of the time, manner and circumstances under which his ailment was incurred. All this being true, there is no longer anything confidential about the plaintiff's case which prevents a disclosure of all the facts, to the end that the exact truth may be ascertained; and particularly, no occasion exists for specially protecting communications relating to the manner and circumstances of the plaintiff's injury when the entire confidential subject to which they were merely incident has been fully disclosed.

The court is of the opinion that the statute does not contemplate that waiver follows from the mere fact that the patient himself testifies to his physical condition and to the manner and circumstances of his injury. In doing so he need not disclose confidential communications to his physician, and if he do not, the communications are still privileged. It is possible that if the question of waiver depended for solution upon a consideration of the plaintiff's cross-examination and nothing more, the court might give him the benefit of the doubt and hold that he had not consented that the veil of secrecy which the statute casts over his communications with his physicians should be lifted. But the plaintiff's conduct at the trial can not be considered in this piecemeal fashion. Having the right and the opportunity to plant himself upon his privilege and keep

Armstrong v. Street Railway Co.

out all confidential communications, he chose not to do so. Having laid bare every fact which he might wish to be kept private, having allowed portions of his confidences with his physicians to escape him, and then having thrown down all bars by using his confidences with his chief witness, Doctor Burnett, to establish his case, and by consenting that the confidences of a consultation of his physicians be revealed, there are no longer any confidential features about the plaintiff's case, and the reasons underlying the statute would have to be ignored to hold otherwise.

"If any decided cases have attempted to make the rule of privilege a byword by holding to the contrary, they are disapproved." (*In re Burnette,* 73 Kan. 609, 632, 85 Pac. 575.)

As already indicated, when consent was given that Doctor Burnett should reveal the communication made to him in the presence of Doctor Sams, Doctor Johnson, Doctor Bowen, and perhaps others, that communication was no longer privileged, and any physician who was present could testify concerning it. There are decisions to the contrary, but they are clearly unsound. The communication consisted of a statement of the manner and circumstances of the plaintiff's injury. He gave it in order that he might be healed. For the same purpose the plaintiff had given a previous account of the same event to Doctor Bowen. Manifestly the plaintiff can not play fast and loose and make laughing stock of the law by insisting upon two distinct confidences with Doctor Bowen respecting precisely the same subject, one of which he may reveal and the other conceal.

It is not necessary to discuss the subject further. Cases may arise in which breaking the seal of confidence as to a single physician will not waive the privilege as to others, but in view of all the facts this case is not of that character. Neither is it necessary to enter upon a review of the authorities, which are well marshalled in the plaintiff's brief. A numerical majority is opposed to the views which have been expressed.

The court is satisfied with the interpretation given the statute, to which it was already committed by previous decisions. Starting with that conception of the statute, reason, consistency and common sense lead to the results which have been announced. It only remains to be said that since the plaintiff has waived his privilege it no longer exists and will not be a factor in subsequent proceedings in the case.

The judgment of the district court is reversed and the cause is remanded for a new trial.