No. 55,338

The Wesley Medical Center, *Petitioner,* v. Honorable Paul W. Clark, Judge 18th Judicial District of the State of Kansas, Sedgwick County, Position F; and Edward LeStage and Tonie LeStage, Individually and as Co-administrators of the Estate of Joshua LeStage, Deceased; and Medo Mirza, M.D., *Respondents.*

(669 P.2d 209)

14

Opinion filed September 12, 1983.

*James R. Hanson,* of Boyer, Donaldson & Stewart, of Wichita, argued the cause, and *Kenneth P. Stewart* and *John H. Gibson,* of the same firm, were with him on the brief for petitioner.

*Gerald L. Michaud,* of Michaud, Cordry, Michaud, Hutton & Hutton, Chartered, of Wichita, argued the cause, and *Andrew W. Hutton* and *Dwight A. Corrin,* of the same firm, were with him on the brief for respondents, Edward LeStage and Tonie LeStage.

*Eldon L. Boisseau,* of Turner & Boisseau, Chartered, of Wichita, argued the cause and was on the brief for respondent, Medo Mirza, M.D.

*Wayne T. Stratton* and *Harold S. Youngentob,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, were on the brief for the *amicus curiae,* Kansas Hospital Association.

The opinion of the court was delivered by

HOLMES, J.: This is an original action in mandamus filed by The Wesley Medical Center (Wesley) seeking an order to compel the trial judge in a medical malpractice action to deny discovery of medical staff committee meeting minutes and other information in the possession of and belonging to the petitioner,

Wesley. It is the position of Wesley that the documents sought are privileged and not subject to discovery. The respondent Dr. Medo Mirza is aligned in interest with and asserts the same position as Wesley. The Kansas Hospital Association has filed a brief *amicus curiae* supporting the position and arguments asserted by Wesley.

The underlying medical malpractice action was brought by Edward and Tonie LeStage, the parents of Joshua LeStage, deceased, against Dr. Medo Mirza and The Wesley Medical Center. Joshua was born with severe internal birth defects. Shortly after his birth at Wesley, Dr. Mirza attempted to surgically correct Joshua's problems. During the fourth operation, while attempting to locate and repair an esophageal atresia, Dr. Mirza allegedly severed the baby's mainstem bronchus. Sometime after the damaged bronchus was repaired and the operation was completed, the baby suffered cardiac arrest but was resuscitated. A second arrest occurred a short time later and this time Joshua failed to respond to resuscitation efforts and died.

The action brought against Dr. Mirza and Wesley alleged their negligence caused the death of Joshua LeStage. In part, the plaintiffs claim Wesley was negligent in allowing Dr. Mirza to have staff and surgical privileges at its facility. Plaintiffs claim the hospital was aware of Dr. Mirza's incompetence yet negligently allowed him to operate on Joshua. Plaintiffs also alleged other undefined acts of negligence on the part of Wesley.

The plaintiffs filed a motion for production of the following documents:

"1. Any and all reports of the circumstances surrounding the death of Joshua LeStage on January 6, 1980;

2. Any and all reports, records and documents pertaining to investigations of the defendant Medo Mirza;

3. Any and all documents pertaining to restrictions on the practice of the defendant Medo Mirza at Wesley Medical Center, including all records, reports and documents pertaining to the restrictions and limitations of Medo Mirza as a staff member at Wesley Medical Center."

A hearing was held on the motion and Wesley resisted production on the theory that the documents in toto were privileged. The trial court nevertheless ordered that the hospital produce the documents allowing only the excision of the names and addresses of patients or their representatives other than plaintiffs' decedent. The trial court subsequently denied the hospi-

tal's request for permission to take an interlocutory appeal. This original proceeding in mandamus followed.

Wesley, like other accredited and licensed medical facilities, is required to monitor and evaluate the members of its staff. The Wesley Medical staff is an entity within The Wesley Medical Center, and its membership consists of all doctors and dentists authorized by Wesley to practice in its institution. Dr. Mirza was a member of the Wesley staff. All staff members are subject to periodic review by various peer committees as to their practice and functions. The Joint Commission on Accreditation of Hospitals requires:

"The medical staff shall provide mechanisms for the regular review, evaluation, and monitoring of medical staff practice and functions. Such mechanisms shall be designed to maintain high professional standards of care."

The mechanisms usually adopted, and those utilized by Wesley, are peer review committees whose members include staff doctors and dentists who evaluate their fellow practitioners. The documents sought to be protected from discovery are the peer review committee records, minutes, etc., which pertain to Dr. Mirza. Committee records are considered confidential by Wesley and the participating members of the committee.

Ordinarily, mandamus is not a proper action to control discovery proceedings in the trial court, which are subject to the broad discretion of the trial court. K.S.A. 60-801; *Procter & Gamble Co. v. Howard,* 233 Kan. 1025, 666 P.2d 728 (1983). In *Berst v. Chipman,* 232 Kan. 180, 653 P.2d 107 (1982), this court had occasion to consider the propriety of a mandamus action to correct alleged error in a trial court discovery proceeding. Chief Justice Schroeder, speaking for the majority, said:

"At the outset we note that the trial court is vested with broad discretion in supervising the course and scope of discovery. *Vickers v. City of Kansas City,* 216 Kan. 84, Syl. ¶ 2, 531 P.2d 113 (1975). Though the trial court's discretion cannot be controlled by mandamus, where an order of the trial court denies a litigant a right or privilege which exists as a matter of law, and there is no remedy by appeal, mandamus may be invoked. *Hulme v. Woleslagel,* 208 Kan. 385, 493 P.2d 541 (1972). In addition, where a petition for mandamus presents an issue of great public importance and concern, the court may exercise its original jurisdiction in mandamus and settle the question. See *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, 239-43, 436 P.2d 982 (1968); *A.T. & S.F. Hospital Ass'n v. State Commission of Revenue & Taxation,* 173 Kan. 312, 316, 246 P.2d 299 (1952)." p. 183.

The privileged status of hospital committee records is a matter of first impression in Kansas appellate courts. It appears there are different views and conflicting rulings on this question in our own trial courts. Under the circumstances the matter is of sufficient public importance and concern to warrant our considering the question on the merits in this proceeding.

Several arguments are raised by Wesley in support of its contention that the requested documents are not subject to discovery. Initially Wesley asserts that its peer review documents are absolutely privileged as a matter of law and in support thereof relies upon K.S.A. 65-431 and K.A.R. 28-34-6. The statute provides in part:

"The licensing agency [the Department of Health and Environment] shall adopt, amend, promulgate and enforce such rules and regulations and standards with respect to the different types of medical care facilities to be licensed hereunder as may be designed to further the accomplishment of the purposes of this law in promoting safe and adequate treatment of individuals in medical care facilities in the interest of public health, safety and welfare."

Pursuant to the authority granted in the statute, the Department of Health and Environment promulgated K.A.R. 28-34-6, which Wesley contends creates an absolute privilege from discovery. The regulation states in part:

"**Medical Staff.** (a) The hospital shall have an organized medical staff, responsible to the governing authority of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members.

"(b) In any hospital, a group comprised of the medical staff, with the approval of and subject to final action by the governing authority, shall formulate and adopt bylaws, rules, regulations, and policies for the proper conduct of its activities and recommend to the governing authority physicians considered eligible for membership on the medical staff.

"(c) The medical staff shall hold regular meetings for which records of attendance and minutes shall be kept.

"*(d) Medical staff committee minutes and information shall not be a part of individual patient records nor subject to review by other than medical staff members.*

"(e) The medical staff shall review and analyze at regular intervals the clinical experience of its members in the various departments of the hospital and the medical records of patients on a sampling or other basis. All techniques and procedures involving diagnosis and treatment of patients shall be reviewed periodically and shall be subject to change by the medical staff." (Emphasis added.)

Wesley contends that subsection (d) of the regulation prohibits

discovery of the requested documents and creates an absolute statutory privilege. We do not agree.

The statutory provision under which civil discovery proceedings are conducted reads in pertinent part as follows:

"Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows: (1) *In general:* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, 'or other tangible things and the identity and location of persons having knowledge of any discoverable matter." K.S.A. 60-226(*b*).

In *Alseike v. Miller*, 196 Kan. 547, Syl. ¶ 11, 412 P.2d 1007 (1966), we held:

"Privilege, within the meaning of our statutes governing discovery, is the privilege as it exists in the law of evidence."

Our evidence code is quite specific as to privileges. K.S.A. 60-407 is a general abolition of privileges. That section states:

"Except as otherwise *provided by statute* (*a*) every person is qualified to be a witness, and (*b*) no person has a privilege to refuse to be a witness, and (*c*) no person is disqualified to testify to any matter, and (*d*) no person has a privilege to refuse to disclose any matter or to produce any object or writing, and (*e*) no person has a privilege that another shall not be a witness or shall not disclose any matter or shall not produce any object or writing, and (*f*) all relevant evidence is admissible." (Emphasis added.)

K.S.A. 60-423 *et seq.* set forth the specific statutory privileges. Nowhere in the statutes is there a privilege for hospital committee records or staff committee minutes or any other self-evaluation or self-policing information or peer review notes. Because K.A.R. 28-34-6(d) was duly adopted pursuant to statutory authority and has the force and effect of law (see *Carpenter v. Johnson,* 231 Kan. 783, 789, 649 P.2d 400 [1982]), Wesley contends that a valid statutory privilege from discovery was created. Furthermore, since the legislature did not modify the regulation, as it had authority to do under K.S.A. 1982 Supp. 77-426, the petitioner asserts the legislature has approved and adopted this privilege. The same argument was found to be without merit in *Grauer v. Director of Revenue,* 193 Kan. 605, 608, 396 P.2d 260 (1964). An administrative agency which has the power to adopt regulations does not have authority to adopt regulations which exceed the statutory authority granted in the first instance. As

said in *Grauer,* "water cannot rise above its source." 193 Kan. at 608. See also *Woods v. Midwest Conveyor Co.,* 231 Kan. 763, Syl. ¶ 3, 648 P.2d 234 (1982).

Nowhere in the statutes is authority granted to the Department of Health and Environment to expand the scope of evidentiary privileges or limit the scope of discoverable matter. Whatever else K.A.R. 28-34-6(d) might accomplish, it does not rise to the level of a privilege created or "provided by statute." K.S.A. 60-407; *Alseike v. Miller,* 196 Kan. 547; *McKillop v. Regents of University of California,* 386 F. Supp. 1270 (N.D. Cal. 1975). To hold otherwise would permit every administrative agency with authority to adopt regulations to avoid our code of civil procedure and other statutes by the simple procedure of adopting regulations which are not subjected to the legislative scrutiny usually applied to the enactment of statutes.

Petitioners have cited a number of cases from our sister states in support of their position but an examination of the cases indicates that most of those states have enacted statutes specifically addressing the confidentiality of medical staff committee or peer review records and minutes. Kansas, however, has not enacted such a statute. On at least four occasions bills which would limit or prohibit discovery of hospital committee records have been before legislative committees and none has ever been presented to the full legislature for a vote. We find no statutory privilege protecting the requested documents from discovery.

Wesley next asserts that portions of the information sought in the malpractice case relate to medical records of persons other than plaintiffs' decedent and that such information and documents are subject to the physician-patient privilege under K.S.A. 60-427. Mr. and Mrs. LeStage, as respondents, assert the physician-patient privilege does not apply as Wesley is not the "holder of the privilege" and therefore has no authority to assert it. K.S.A. 60-427(*a*)(3) provides:

" '[H]older of the privilege' means the patient while alive and not under guardianship or conservatorship or the guardian or conservator of the patient, or the personal representative of a deceased patient."

The physician attending the patient is not the holder of the privilege. *State v. Humphrey,* 217 Kan. 352, 362-363, 537 P.2d 155 (1975). K.S.A. 60-427(*b*) provides the conditions under which the "holder of the privilege" may assert the privilege or prevent

others from revealing the privileged information. While it is true that the physician, or in this case the hospital, is not the "holder of the privilege" that does not mean that a physician, absent statutory authority, may reveal, ex parte, information subject to the privilege without the knowledge and consent of the patient or holder of the privilege. Similar restraints apply to confidential records of hospitals and other treatment facilities unless otherwise provided by statute. Records in the possession of Wesley which are subject to the physician-patient privilege under K.S.A. 60-427(b) would not ordinarily be discoverable without notice to and the consent of the holder of the privilege. In any instance where there is a valid question as to whether the privilege applies, the court should hold an in camera inspection to determine if the information sought is actually subject to the privilege and what protective orders should be issued. However, the existence of a valid physician-patient privilege as to some of the documents or proceedings of the peer review committees does not compel or justify a blanket protective order refusing discovery of all records and documents. The determination of the existence of the physician-patient privilege must be determined upon a case-by-case or document-by-document basis after the assertion is made that the requested information is actually subject to the privilege. The use of redaction, as ordered here by the trial court, may or may not afford sufficient protection and anonymity to make information, which would otherwise be privileged, discoverable.

Wesley next asserts that as a matter of public policy, the information sought is confidential, necessary for the maintenance and improvement of the quality of health care, and therefore is protected regardless of any statutory privilege. It asks that we establish by judicial fiat an absolute privilege preventing discovery of the records. In *Berst v. Chipman,* 232 Kan. 180, we recognized that in certain situations a qualified privilege against disclosure of confidential matter may exist independent of a specific statutory privilege. *Berst* was an original proceeding in mandamus filed in this court seeking an order directing the trial judge to deny discovery of certain alleged confidential information and documents. The documents sought related to confidential investigations conducted by the National Collegiate Athletic Association and the Southeastern Conference of possible infrac-

tions of NCAA recruiting rules by the University of Alabama. The documents were sought for use in a libel action against the Birmingham Post Company filed by a high school principal and one of the school's basketball stars. The court recognized that pursuant to K.S.A. 60-226(c), the trial court has the power to limit discovery and to issue such protective orders as may be necessary to protect the conflicting interests of the parties. The court stated:

"Where the parties have conflicting interests in material sought to be discovered, the protective power of the court may be sought by a party . . . and the court must balance the litigant's interest in obtaining the requested information with the resisting party's interest, as well as the public interest in maintaining the confidentiality of the material. [Citations omitted.]

. . . .

"In balancing the interests involved herein it must be recognized the parties involved in the lawsuit have a great interest in the revelation of all pertinent facts. It is an oft-quoted doctrine that the public has a right to every man's evidence; there is a general duty to give what information one is capable of and any exemptions are exceptional, being in derogation of a positive general rule [citations omitted] . . . .

. . . .

"Additional guidelines considered in balancing claims of privilege with the need for disclosure include the degree of harm that would be caused by disclosure and the type of controversy before the court. [Citations omitted.] Also, the public interest may be a reason for not permitting inquiry as to particular matters by discovery." 232 Kan. at 187-89.

Thus, it is clear that under certain circumstances the trial court, under its general supervisory powers, may limit discovery of material not specifically subject to a statutory privilege.

That the instant case involves a controversial and important area of the law is evidenced by the number of cases cited by the parties on the subject and the number of states having statutes addressing medical peer review records. Petitioner, in its brief to this court states:

"Hospitals are responsible for improving the quality of care in the institution. As previously stated, Federal and Kansas statutes and regulations, JCAH requirements, and the hospital internal rules, require such efforts. As a practical matter only medical staff members can carry out these responsibilities. As a matter of public policy, the deliberations and free discussions of these physician committees should not be subject to discovery or introduction into evidence at trial. The committee deliberations are part of a process required of physicians keeping their professional practice up to acceptable standards. If they are to be effective in this endeavor they cannot and must not have their consideration subject to scrutiny by outsiders. Simply stated, if these minutes in any form are to

be subject to discovery or introduction into evidence, there will result total erosion of an efficient system of peer review. Not only will quality of care directly suffer, but medical education will suffer. To permit discovery will defeat attainment of the goals of the committees and will run contrary to legal requirements."

Perhaps the leading case, relied upon by Wesley, on the subject of confidentiality and privilege for hospital staff reviews is one cited in *Berst.* In *Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C. 1970), *aff'd* 479 F.2d 920 (D.C. Cir. 1973), it was said:

"This committee work is performed with the understanding that all communications originating therein are to be confidential.

"Confidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.

"The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques. They are not a part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures. The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable. This value would be destroyed if the meetings and the names of those participating were to be opened to the discovery process.

" 'The public interest may be a reason for not permitting inquiry into particular matters by discovery.' 4 Moore, Federal Practice ¶ 26.22(2) at 1287 (2d ed. 1969). As doctors have a responsibility for life and death decisions, the most up-to-date information and techniques must be available to them. There is an overwhelming public interest in having those staff meetings held on a confidential basis so that the flow of ideas and advice can continue unimpeded. Absent evidence of extraordinary circumstances, there is no good cause shown requiring disclosure of the minutes of these meetings. Further, 'what someone * * * at a subsequent date thought of these acts or omissions is not relevant to the case.' Richards v. Maine Central R., 21 F.R.D. 590 (D.C. Me. 1957). These committee meetings, being retrospective with the purpose of self-improvement, are entitled to a qualified privilege on the basis of this overwhelming public interest." pp. 250-251.

The District of Columbia court operates under discovery rules similar to those in Kansas and, like Kansas, does not have a statute exempting this material from liberal discovery. The petitioner urges us to follow *Bredice.* Wesley cites several additional

decisions in support of its position but an examination of those cases discloses that most, if not all of them, are based upon various state statutes which establish a privilege or some degree of protection for records similar to those sought in this case. As those decisions are based upon specific statutory authority, we do not deem them persuasive. Indeed, we are advised in the very informative *amicus* brief of the Kansas Hospital Association that "at least 46 states provide some degree of protection [of peer review committee records] from discovery through statutory law."

On the other hand, Mr. and Mrs. LeStage assert that absent statutory protection there is no overwhelming public policy that precludes the discovery of the sought-after records so long as they are relevant to the issues before the trial court. In *Nazareth Literary & Benevolent Inst. v. Stephenson*, 503 S.W.2d 177 (Ky. 1973), the court held that reports of staff doctors concerning the professional activities of a defendant doctor in a malpractice action were discoverable. The hospital in that case was also a defendant and similar arguments to those presented by Wesley, including reliance upon *Bredice*, were presented to the court. The court, in allowing discovery, stated:

"The second proposition advanced by the hospital is addressed to considerations of public policy. It is argued that this court should engraft an exception to the procedural rules for discovery that such reports as are sought here must remain confidential because their revelation would impede the freedom of communication between physicians and hospital authorities concerning proper methods of treatment and the corrections of mistakes. Although this might be regarded as an initially appealing argument, on reflection, one might well debate wherein the public interest lies. Claims of privilege are carefully scrutinized, and impediments to the discovery of truth are afforded validity in relatively few instances in the common law. In any event, we find no applicable privilege expressed in either the general law of evidence existing in this state or in the statutes of this state expressing any protection of confidentiality in the situation presented.

"Under CR 26.02, as presently formulated, the expressed policy is that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, and this includes the existence, description, nature, custody, condition and location of any documents and the identity and location of persons having knowledge of any discoverable matter. It is unnecessary to consider whether the limiting word 'relevant' is used in the sense of the law of evidence or whether it is used in the common dictionary sense. The expression in the rule is 'relevant to the subject matter involved in the pending action.' There can be no question in the case before us that the requested material is surely relevant to the subject matter involved in the

personal injury suit which asserts liability against the hospital for the alleged incompetent action or omission of the physician who possessed staff privileges.

"The only authority favorable to the hospital's contention is the two decisions of the Federal District Court for the District of Columbia in Bredice v. Doctors' Hospital, Inc., 50 F.R.D. 249 (1970), and Bredice v. Doctors' Hospital, Inc., 51 F.R.D. 187 (1970). We consider that the applicability of those decisions to the situation presented in this case was seriously undermined in Gillman v. United States, 53 F.R.D. 316 (D.C.S.D.N.Y. 1971).

"In Bredice the trial judge judicially created a qualified privilege under the federal rules of procedure as they then existed with respect to staff conferences and reports concerning a patient's death. In Gillman, however, the trial judge, although paying decent respect to the decision in Bredice, refused to extend it beyond its precise facts and held that although the plaintiff was not entitled to production of reports of a board of inquiry set up by the director of a hospital after a patient's suicide to determine whether hospital personnel should be disciplined or hospital procedures changed, the plaintiff was, nevertheless, entitled to the testimony of hospital personnel given before the board of inquiry relating to what actually happened on the occasion that was the subject of plaintiff's pending civil action for damages allowable under the Federal Tort Claims Act.

"In our view, the correct disposition is declared in Kenney v. Superior Court, 255 Cal. App. 2d 106, 63 Cal. Rptr. 84 (1967). In the Kenney case, the court considered an application for extraordinary relief in the form of an order of mandamus. The court held that the plaintiff who had sued a physician for medical malpractice was entitled to discovery of any hospital records of the physician's disciplinary proceedings, status on the hospital staff, and removal therefrom. For a general discussion see Annotation: Discovery — Medical Malpractice Action, 15 ALR 3d 1446.

"It is interesting to note that we are not here dealing with the question of a request for a protective order. The hospital did not seek a protective order for control or limitation or deletion of portions of the written material. It espoused the argument that the written material was simply not discoverable." pp. 178-179.

Judge Gard, in his informative work, states:

"At common law there was no physician-patient privilege and the physician as well as the client could be compelled to testify as to communications even though they were confidential. The privilege is strictly a creature of statute. For this reason the statute has been strictly construed in Kansas. See Armstrong v. Topeka R. Co., 93 K 493, 144 P 847. Some states do not have such a privilege at all." 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-427 (1979) pp. 140-141.

The United States Supreme Court in *United States v. Nixon,* 418 U.S. 683, 41 L.Ed.2d 1039, 94 S.Ct. 3090 (1974), was faced with a determination of whether confidential communications between a president of the United States and his closest personal advisors was subject to a nonstatutory privilege and therefore not discoverable as a matter of public policy. In ordering discovery the court stated:

"The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. . . .

. . . .

. . . "The privileges referred to by the Court are designed to protect weighty and legitimate competing interests. Thus, the Fifth Amendment to the Constitution provides that no man 'shall be compelled in any criminal case to be a witness against himself.' And, generally, an attorney or a priest may not be required to disclose what has been revealed in professional confidence. These and other interests are recognized in law by privileges against forced disclosure, established in the Constitution, by statute, or at common law. *Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.*" pp. 708-710. (Emphasis supplied.)

While it may be true that some members of the medical profession might seek to shirk their duties to others in the profession and to the public by refusing to participate in peer review functions or, in doing so, might be less than candid in their comments and evaluations, we do not ascribe such a lack of integrity to the vast majority of the members of the medical profession. The integrity of the medical profession is held in high esteem by the public and by the courts and we are not convinced that the occasional revelation, under appropriate protective and limiting orders of the trial court, of some peer review committee proceedings will result in the drastic collapse of the system as envisioned by Wesley. As indicated, many of the decisions relied upon by Wesley involve statutes which specifically protect hospital peer review records and minutes from discovery. Absent statutory protection it appears that most jurisdictions do not give blanket protection to such proceedings. Numerous cases, pro and con, on the public policy arguments of whether alleged confidential communications are subject to a nonstatutory qualified privilege are cited and discussed in *Berst*. We see no reason to repeat here what has been said in that opinion. Suffice it to say the court adopted the position that a balancing test is appropriate in determining whether the trial court should assert its supervisory powers to protect confidential information not subject to a statutory privilege from discovery.

We deem the instant case to be analogous to *Berst* and that the procedures set forth therein are equally applicable and appropriate for the control of the discovery of peer review committee proceedings.

While there may be instances where peer review committee minutes and records and other confidential hospital documents should be denied discovery under the broad supervisory powers of the court, we decline to adopt an absolute statement of public policy declaring all such records to be protected in toto. If such a privilege is to be established it should be done by the legislature. In individual cases the balancing test discussed in *Berst* should be followed. In the instant case, the trial court, in a lengthy and well-reasoned opinion, stated:

"Now to the 'public policy' issue. Defendant and the hospital are joined. Good hospital care requires review of medical procedures used by the hospital's medical staff. It would seem that those best qualified to review medical procedures used by a medical staff would be that body itself. The patient is the ultimate beneficiary of this peer review of diagnostic and treatment procedures. For that reason the licensing authority has enacted certain rules and regulations requiring that the hospital's medical staff police itself with the ultimate authority and responsibility coming to the governing authority of the hospital. The regulations require that a record be kept by the medical staff of its actions in this policing of itself through peer review. Staff findings are not part of the patient's records and they are not open for view other than by medical staff.

"As aforesaid, in carrying out its duty of peer review, the hospital's medical staff has reviewed the defendant's methods of diagnosis and treatment through a special investigation which reviewed care and treatment rendered plaintiffs' decedent and other patients of defendant who were diagnosed and/or treated in the hospital. The hospital is of the position that public policy would dictate that the materials gathered and minutes kept by that investigative body be kept confidential. Discovery ought to be denied, they say.

"Plaintiffs, on the other hand, say that their right to search out the truth through the judicial process is the consideration that weighs most under these facts.

"There is a public interest served by the regulation (supra) that restricts access to minutes of medical staff meetings to medical staff. There is a public interest served by the Kansas Rules of Discovery that allow a party litigant access to relevant material in the control of a party opponent.

"Under the facts here presented, the public interest will be best served by allowing these plaintiffs access to the materials sought under certain guidelines established by the Court to protect all interests involved (Rules of the Supreme Court relating to District Courts . . . 1, 2, 3 and 4 - 230 Kan. lxvi, *Gleichenhaus vs. Carlyle*, [226 Kan. 167, 597 P.2d 611 (1979)]).

"This is the Court's order: the hospital shall on or before fourteen (14) days from the date of this order, produce legible copies of all documents or things in its possession or under its control that:

1. Relate in any way to the circumstances surrounding the January 6, 1980, death of plaintiffs' decedent, Joshua LeStage.

2. Relate in any way to an investigation or investigations conducted by any person, group or entity under the control of the hospital or its medical staff; into the techniques and procedures involving diagnosis and treatment of patients by defendant Medo Mirza, M.D.

3. Relate in any way to any restrictions or limitations placed by the hospital or recommended by its medical staff upon the activities of defendant Medo Mirza, M.D.

"All names and addresses of patients or representatives thereof, other than plaintiffs' decedent, shall be removed from all documents or things produced by the hospital.

"The hospital may comply with this order by delivering to its attorney of record three copies of the documents or things herein ordered produced together with a statement for cost of reproduction of each copy. Upon payment of cost, the defendant and plaintiffs shall have their respective copies. The hospital's attorney shall keep the third.

"Each page or part of each copy ordered produced shall be marked by the hospital in such a way as to identify the particular copy and each page or part of that particular copy. The hospital's attorney shall inform the Court in writing which party received which copy.

"It is ordered that the documents and things ordered produced here or the contents thereof shall not be disclosed to any other person or entity without prior court approval, nor shall they be used for any purpose other than discovery, preparation for trial and trial of this lawsuit."

In *Berst* we said:

"Where the parties have conflicting interests in material sought to be discovered, the protective power of the court may be sought by a party under this provision, and the court must balance the litigant's interest in obtaining the requested information with the resisting party's interest, *as well as the public interest* in maintaining the confidentiality of the material." 232 Kan. at 187. (Emphasis added.)

Thus, it is obvious that the trial court recognized its responsibility under *Berst* and, having weighed the interests of all parties, applied the balancing test of *Berst* and determined that the sought after documents were discoverable. We find no abuse of discretion in that determination.

The trial court did not conduct an in camera inspection in this case. Wesley had not sought a protective order as to particular documents but merely contended in the trial court, as it does here, that all records and minutes of the peer review committees were privileged and therefore not subject to discovery. In *Berst* the court considered the advisability of an in camera inspection and stated:

"For this reason the trial court erred in failing to conduct an in camera inspection of the NCAA's file to determine which documents were not relevant and thus not discoverable. An in camera inspection is an appropriate and useful proceeding to ensure that the balance is properly struck between a petitioner's claim of irrelevance and privilege, and a plaintiff's need for the documents. [Citations omitted.] When a trial court orders production of confidential records, it has a duty to limit the availability and use of documents by carefully drawn protective provisions. [Citations omitted.] We believe when a claim of privilege, confidentiality or irrelevance is raised the court has a duty to conduct an in camera inspection to separate and permit discovery of only the relevant documents, thereby protecting against unnecessary and damaging disclosure of irrelevant confidential material." pp. 186-187.

Even though the confidential information may be relevant, the trial court is still under a duty, when properly requested, to conduct an in camera inspection and apply the balancing test to determine if the sought-after information is discoverable. If, upon further proceedings, Wesley is of the opinion that certain of the subpoenaed documents are subject to the physician-patient privilege or require protection under K.S.A. 60-226(c) it should seek an in camera inspection and the same should be conducted by the trial court. On the other hand, it may be that the order already issued will be considered adequate protection by all parties.

Finally, Wesley asserts that the documents and information sought are not relevant. The trial court in its memorandum opinion and order specifically found that the sought-after information was relevant to material issues in the case. The trial court is vested with broad discretion in supervising the course and scope of discovery and the trial court's discretion cannot be controlled by mandamus. *Berst v. Chipman*, 232 Kan. at 183. The allegation of Wesley that K.S.A. 65-442(b) controls is found to be without merit under the factual allegations of this case.

The petition for a writ of mandamus is denied.

SCHROEDER, C.J., dissenting: The overwhelming considerations of public policy for refusing to allow disclosure of confidential hospital peer review committee records and minutes were well stated in *Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249, 250-51 (D.D.C. 1970), *aff'd* 479 F.2d 920 (D.C. Cir. 1973), the pertinent portion of which is quoted in the majority opinion. In declining to follow *Bredice* and holding there is no overwhelming public policy that precludes the discovery of these

materials in the absence of specific legislation, the majority apparently deems those adverse effects of ordering disclosure discussed in *Bredice* to be so insignificant and slight not to outweigh the plaintiff's interest in discovery. I disagree.

The majority attempts to discredit the rationale of *Bredice* by quoting from *Nazareth Literary & Benevolent Inst. v. Stephenson*, 503 S.W.2d 177 (Ky. 1973), in which it was stated the applicability of *Bredice* was "seriously undermined" in *Gillman v. United States*, 53 F.R.D. 316 (S.D.N.Y. 1971). The characterization of the decision in *Gillman* by the court in *Nazareth* is misleading and should be given little, if any, weight in this court's consideration of the instant case. The court in *Gillman* expressly agreed with and followed the holding in *Bredice* in holding that the discovery of the minutes and reports of the hospital's Board of Inquiry concerning a patient's suicide were not discoverable by the plaintiff. However, the court ordered disclosure of statements made by hospital personnel to the Board as to what actually happened concerning the incident, recognizing that "[s]tatements taken shortly after an occurrence are unique and can never be duplicated precisely," and that the discovery of factual data relied on by the Board would not impair the quality of the testimony by hospital employees before the Board. 53 F.R.D. at 319. The important distinction made in *Gillman* between the discovery of purely factual investigative matters and materials which are the product of reflective deliberation or policy-making processes, such as the reports and minutes of a medical review committee, was properly and accurately noted in *Tucson Medical Center, Incorporated v. Misevch*, 113 Ariz. 34, 37, 545 P.2d 958 (1976).

In *Berst v. Chipman*, 232 Kan. 180, 189, 653 P.2d 107 (1982), this court quoted with approval 8 Wigmore on Evidence § 2285, p. 527 (McNaughton rev. 1961), setting forth four prerequisites for granting a qualified privilege from discovery in a case. These prerequisites are:

"(1) The communications must originate in a *confidence* that they will not be disclosed.

"(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

"(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

"(4) The *injury* that would inure to the relation by the disclosure of the

communications must be *greater than the benefit* thereby gained for the correct disposal of litigation." (Emphasis in original.)

Each of these conditions is present in the instant case. The peer review committee proceedings at Wesley are considered confidential by Wesley and those who participate. As discussed in *Bredice* and reiterated in the following cases, confidentiality is essential to maintaining the relation between the parties; this relation is one which should be fostered; and the injury to the public is greater than the benefit gained by the litigants. In discussing the public policy rationale underlying the Arizona statute precluding the discovery of reports and minutes of medical review committees, the court in *Tucson Medical Center, Incorporated v. Misevch,* 113 Ariz. at 38, stated:

"In a hospital accredited by the Joint Commission on Accredited Hospitals (JCAH), the medical staff is responsible to the governing body of the hospital for the quality of hospital patient care. It therefore evaluates the qualifications of applicants and members to hold staff privileges and recommends curtailment and exclusion when necessary. . . . Bearing the delegated responsibility for review, the candor of the members is necessary in the consideration of their colleagues' skills towards objectively regulating privileges, and the quality of treatment so depends. . . .

. . . .

"Furthermore, the medical review of a procedure is not a part of current patient care, but is a retrospective discussion of treatment and, absent extraordinary circumstances, there is no good cause for disclosure in light of the considerable public interest to the contrary."

The court in *Dade County Med. Ass'n v. Hlis,* 372 So. 2d 117 (Fla. Dist. Ct. App. 1979), held that although the statutory privilege for medical review committee records did not apply under the particular facts of the case, the considerations of public policy which prompted the recent enactment of the statute could not be overlooked and precluded the disclosure of the records. On this point the court observed:

"The function of the Ethics Committee of the DCMA, the records of which were ordered produced below, is to investigate, consider and discuss issues which involve the professional conduct of its member physicians. We think it self-evident that this activity, as a means of improving the quality of medical practice in our community through self-regulation, is a salutary one which should be encouraged. More to the point as to the issues presented here, we also agree with petitioner that it is important, perhaps indispensable, to the achievement of the committee's purposes that its proceedings remain confidential. It is obvious that both complaints and free discussion about the activities of physicians would

be markedly discouraged if their contents were to be held open to public perusal." p. 119.

This court is asked whether the public benefits which flow from open, candid communication between hospitals and review committees is so substantial and could be so impaired by the prospect of public disclosure that a privilege for such communication should be recognized even without specific authority from traditional sources. The numerous cases cited to this court by the parties in their briefs show that other jurisdictions faced with a similar issue have reached different results. See, e.g., Annot., Discovery of Hospital's Internal Records or Communications as to Qualifications or Evaluations of Individual Physician, 81 A.L.R.3d 944. As these cases demonstrate, considerations of public policy bring different courts to different results, depending upon whether the public interest in confidentiality of hospital inspection committee matters or the public interest in liberal discovery is weighed more heavily in the balance. Here the majority holds that in the absence of legislative action the public interest in maintaining the confidentiality of the files of Wesley Hospital's peer review committee is not sufficient to outweigh the interest in discovery of relevant information in a lawsuit. The court's decision will discourage hospitals from making investigations which are calculated to have a positive effect on improving the quality of health care in such institutions. The court's decision will also encourage physicians practicing in those hospitals to accept and care for only those patients with uncomplicated health infirmities where the probability of success is reasonably sure, where the risk of error is slight, and the risk of malpractice claims is slight.

Hospitals in this state are required by administrative regulation to review and analyze the professional practices of their members in furtherance of the express purpose of K.S.A. 65-431 to promote "safe and adequate treatment of individuals in medical care facilities in the interest of public health, safety and welfare." The maintenance of the confidentiality of the peer review system established by K.A.R. 28-34-6 is essential to the system's success in fulfilling the purpose of K.S.A. 65-431. This court's decision will gravely undermine the effectiveness and central purpose of such committees, and will effectively nullify efforts of hospitals to comply with the regulations.

The public policy behind the enactment of the statute and

regulation cannot be overlooked. This public policy justifies the grant of a qualified privilege from discovery for these types of reports even in the absence of specific legislation. Under K.A.R. 28-34-6, promulgated under the authority of K.S.A. 65-431, hospitals are required, through the peer review committee system, to evaluate and review the actions of its member physicians. If discovery is permitted, the flow of candid and critical information essential to compliance with the regulation will cease, resulting only in errors which will not be discussed or corrected, thereby nullifying the purpose behind the enactment of the regulation. The belief expressed by the majority that the vast majority of doctors will not "shirk their duties to others in the profession and to the public by refusing to participate in peer review functions or, in doing so, might be less than candid in their comments and evaluations," *ignores the reality of human nature* to refrain from open evaluation and candid criticism of a colleague where such may be used as damaging evidence by a plaintiff in a future lawsuit against the doctor or medical institution. A similar sentiment was expressed by the court in *McKillop v. Regents of University of California,* 386 F. Supp. 1270, 1276 (N.D. Cal. 1975), in refusing to order the disclosure of tenure evaluation reports:

"Plaintiff's suggestion that full disclosure encourages more thoughtful and honest tenure evaluations represents a somewhat utopian view of human relationships. It is a view which does not accord with that of University-level faculty members on record here, nor with the Court's own experience in dealing with recommendations and the like."

The majority's view that the disclosure of these records will not have a serious negative impact on the successful and meaningful continuation of the peer review system is strongly disputed by Wesley and *amicus curiae* Kansas Hospital Association. The hospital association in its brief states:

"[T]he intent of the peer review process is to control the quality of patient care, and the misuse of committee records as weapons brought by physicians denied privilege or by patients in malpractice lawsuits will destroy effective review — and the patients and the public will be the losers. The exposure to liability is ever present, but to require the production of committee records is to invite disaster by discouraging doctors from participating or inhibiting their participation. The facts of life are that good peer review requires physicians to be candidly critical of other physicians, and opening committee records to malpractice lawyers will have a stifling effect on that candor."

The communications which are the subject of this lawsuit were made in reliance on the expectation they would not be disclosed. In my opinion the element of confidentiality is essential to the promotion of a professional and harmonious relationship of the parties who participate in the hospital peer review system. The continuation of a professional and harmonious relationship is one which ought to be fostered. It is my opinion that in weighing the potential effects of ordering disclosure against the potential benefits of disclosure the scales tip decidedly in favor of protecting the confidentiality of the hospital peer review system which embodies a broader societal value.

It is respectfully submitted an order in mandamus should issue directing the trial judge to deny discovery of medical staff committee meeting minutes and other information in the possession of and belonging to the petitioner, Wesley.